[Cite as *State v. Barker*, 2016-Ohio-8006.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                      Court of Appeals No. WD-15-035

　　　　Appellee                                   Trial Court No. 14 CR 034

v.

Scott Barker                                       **DECISION AND JUDGMENT**

　　　　Appellant                                  Decided: December 2, 2016

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, Thomas A.
Matuszak, Chief Assistant Prosecuting Attorney, and David T.
Harold, Assistant Prosecuting Attorney, for appellee.

Mollie B. Hojnicki-Mathieson, for appellant.

* * * * *

**JENSEN, P.J.**

{¶ 1} Defendant-appellant Scott Barker appeals the April 15, 2015 judgment entry of the Wood County Court of Common Pleas sentencing him to eight years in prison on one count of sexual battery, in violation of R.C. 2907.03(A)(2) and (B), a felony of the second degree. Barker now appeals. For the reasons set forth below, we affirm.

**{¶ 2}** Barker married T.W. ("grandmother") in 2013. He is the stepfather to H.S. ("mother") and the step-grandfather to J.K., N.S., A.S. and H.S.

**{¶ 3}** In January 2014, mother's adult daughter, J.K., was scheduled to have a child by cesarean at the Toledo Hospital. Mother wanted to be with her oldest daughter in the hospital, so she asked grandmother if she could watch her three younger daughters for the weekend. At the time, N.S. was 10 years old, A.S. and H.S. were 11 and 6, respectively.

**{¶ 4}** On Friday, January 17, 2014, grandmother and Barker drove to mother's home and picked up N.S., A.S. and H.S. The couple drove the children back to their apartment in Perrysburg Township, Wood County, Ohio.

**{¶ 5}** The young girls hung out in the apartment's first floor living area for most of the evening. They watched movies and used their personal electronic devices. Sometime after midnight, the young girls went to sleep. N.S. slept on the end of the sofa closest to the stairway leading to the apartment's second floor bedrooms.

**{¶ 6}** At trial, N.S. testified that at approximately 7:30 a.m. on Saturday morning, she woke to someone touching her breasts. She opened her eyes, saw Barker sitting next to her, and quickly shut her eyes again. She wanted to get away from him, but did not move because she "didn't know what was going to happen."

**{¶ 7}** While peeking through semi-closed eyelashes, N.S. saw Barker pull the front of her pants down. Barker then pulled N.S.'s underwear down, opened her legs, and used his fingers to touch her private area. At first, N.S. thought she was dreaming. When she

2.

realized what Barker was doing, she made the decision to let Barker know she was awake. N.S. explained: "I like, rubbed my eyes to wake – and then he was looking at my face at the time and I was rubbing my eyes like moving a little and then he stopped and pulled up my pants and underwear."

{¶ 8} N.S. testified that for the five minutes Barker was touching her, grandmother was upstairs using the restroom and her sisters were in the living area, asleep. When he was finished touching N.S., Barker went to the kitchen to turn on the coffee maker. N.S. wanted to call mother, but was afraid mother would call grandmother and Barker would "come down" to hurt her "or something else." Uncertain what to do, N.S. continued to lie on the couch until she drifted back to sleep.

{¶ 9} N.S. testified that on Sunday morning or early afternoon, Barker gave her a back rub. At some point, Barker slid his hands under N.S.'s shirt, reached around, and fondled her breasts. Later that day, grandmother took N.S. to the hospital to visit her oldest sister, J.K., and the baby. When N.S. was alone with J.K., she cried as she explained to her sister what Barker had done.

{¶ 10} At her older sister's insistence, N.S. told mother what happened. J.K. called a nurse to ask for advice. While still at the hospital, mother called the Toledo Police Department. According to mother, Toledo Police instructed her to contact Perrysburg Township Police.

{¶ 11} Later that evening, mother took N.S. home and instructed her to take off her shorts and underwear, clothes N.S. had worn the entire weekend. Mother put the

3.

clothes in a plastic grocery bag. The following day, mother called the Perrysburg Township Police Department.

{¶ 12} A day later, Todd Curtis, a detective from the Perrysburg Township Police Department, visited N.S. at her home. N.S. described to the detective what had occurred the previous weekend. At trial, Detective Curtis testified that upon reflecting on all the statements made by N.S. in conjunction with the case, he found no inconsistencies.

{¶ 13} Jennifer Bauman is a Sexual Assault Nurse Examiner ("SANE") at the Toledo Hospital. On January 20, 2014, Nurse Bauman met with and examined N.S. Nurse Bauman testified that during the vaginal exam, she observed "a little redness" on N.S.'s labia majora. Nurse Bauman indicated that while she was swabbing the labia minora, N.S. blurted out "That's what it felt like when he touched me. * * * That's what he was doing, he was rubbing and spreading it."

{¶ 14} When asked about her findings, Nurse Bauman opined that the redness on N.S.'s labia majora did not "necessarily mean injury" but that she could not affirmatively rule out injury either. One "very significant" event, in Nurse Bauman's opinion, was N.S.'s outburst during the vaginal examination. Despite having observed and performed numerous rape kits prior to her examination of N.S., no patient had ever blurted out a similar statement during a physical examination.

{¶ 15} Steven Wiechman is employed by the Ohio Bureau of Criminal Identification and Investigation. Wiechman testified that he found male chromosome DNA on the waistband and crotch areas of N.S.'s underwear. Wiechman indicated,

4.

however, that there was insufficient DNA in the sample to identify who the DNA belonged to.

{¶ 16} J.K. testified that prior to trial she observed changes in her younger sister's behavior. In her opinion, N.S. had become "mouthy," "aggressive," and "perverted" since the weekend in question. J.K. explained, "If you would try to tickle [N.S.] and – and you're tickling her by her armpits she'll say, 'You touched my boob,' or if her and her sisters are play fighting and she gets kicked in the thigh she'll say, 'you kicked me in my vagina.'"

{¶ 17} Barker testified that N.S. and at least one of her adolescent sisters spent the weekend of January 17, 2014, at the apartment he shared with grandmother. Barker went to bed before midnight on Friday and woke, with his wife, around 7:30 a.m. on Saturday morning. Upon waking, he went downstairs to use the restroom as his wife used the restroom upstairs. Thereafter, Barker went to the kitchen to make coffee. Once the coffee had brewed, he and his wife sat together at the kitchen table and drank a cup. He denied all allegations against him.

{¶ 18} The jury found Barker guilty on both counts of sexual battery. At the sentencing hearing, Barker was classified as a Tier III Sex Offender. The state agreed that the two convictions were allied offenses of similar import that should be merged. It elected to proceed to sentencing on Count 2 of the indictment, sexual battery in violation of R.C. 2907.03(A)(2) and (B). The trial court sentenced Barker to serve a mandatory term of eight years in prison.

5.

{¶ 19} On appeal, Barker sets forth the following assignments of error:

I.  FIRST ASSIGNMENT OF ERROR:  THE EVIDENCE AT APPELLANT'S TRIAL WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS.

II.  SECOND ASSIGNMENT OF ERROR:  APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

III.  THIRD ASSIGNMENT OF ERROR:  THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.

IV.  FOURTH ASSIGNMENT OF ERROR:  THE TRIAL COURT ERRED BY ALLOWING IMPROPER EVIDENCE BEFORE THE JURY.

**First Assignment of Error**

{¶ 20} In his first assignment of error, Barker alleges that there was insufficient evidence of sexual conduct.  Barker argues "the evidence as it relates to the alleged inappropriate touching, is entirely devoid of any suggestion that there was penetration of any kind."

{¶ 21} When reviewing the sufficiency of evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d

259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997). We will not overturn a conviction for insufficiency of the evidence unless we find that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶ 22} The crime of sexual battery under R.C. 2907.03(A)(2) requires the state prove the offender engaged in sexual conduct with another person—not the spouse of the offender—while knowing or having reasonable cause to believe that the other person's ability to appraise the nature of or control the other person's conduct was substantially impaired. R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

{¶ 23} At trial, N.S. testified that Barker pulled down her shorts and began touching her with both hands. She explained, "He used one hand to kind of, like, open it or something and he used the other hand to, like almost like rubbing it or something, something like that."

{¶ 24} As stated above, "sexual conduct" requires the insertion, however slight, of any part of the body into the vaginal opening of another. R.C. 2907.01(A). In *State v. Grant*, 2d Dist. Montgomery No. 19824, 2003-Ohio-7240, the Second District Court of

7.

Appeals explained that "[t]he vagina is the hollow passage leading from the uterus of the female body outward to the exterior genitalia, or vulva, which is comprised of lip-like folds of skin called the labia majora, the term 'vaginal cavity refers to that entire anatomical process and any part of it.'" *Id.* at ¶ 29. The *Grant* court explained that evidence is legally sufficient to establish "vaginal penetration" if it shows that the force of the offender's index finger "caused the victim's labia or outer lips of the vagina to spread." *Id.* at ¶ 38. *See State v. Ulis*, 6th Dist. Lucas No. L-93-247, 1994 Ohio App. LEXIS 3217 (July 22, 1994), at *5 ("vaginal penetration is not necessary to support a finding that sexual conduct occurred.").

{¶ 25} Additional evidence relevant to this assignment is Nurse Bauman's testimony that while she was swabbing the labia minora, N.S. blurted out "That's what it felt like when he touched me. * * * That's what he was doing, he was rubbing and spreading it."

{¶ 26} We find, after viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found, beyond a reasonable doubt, that sexual conduct occurred. Thus, Barker's first assignment of error is not well-taken.

## Second Assignment of Error

{¶ 27} In his second assignment of error, Barker asserts that his conviction for sexual battery is against the manifest weight of the evidence. Specifically, Barker contends that the jury lost its way when it concluded that he had "engaged in sexual conduct with N.S."

8.

{¶ 28} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A manifest weight challenge requires an appellate court to consider the entire record, including the credibility of witnesses, and determine whether the jury clearly lost its way such that the verdict of guilty resulted in a manifest miscarriage of justice requiring a new trial. *State v. Sharma*, 11th Dist. Lake No. 2015-L-083, 2016-Ohio-7744, ¶ 28. A judgment of a trial court should be reversed as being against the manifest weight of the evidence, "only in the exceptional case where the evidence weighs heavily against the conviction." *Thompkins* at 387. "Determinations of credibility and weight of the testimony are primarily for the trier of fact." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 29} At trial, N.S. explained, in detail, what occurred while she was in Barker's apartment. In turn, Barker testified that the events described did not occur. Other than the S.A.N.E. nurse's testimony and the presence of male DNA on N.S.'s undergarments, there was little corroborating evidence presented at trial.

{¶ 30} Considering all of the evidence together, including the evidence discussed in appellant's first assignment of error, we cannot say the jury lost its way in giving more

9.

credibility and weight to the testimony of N.S. than it did to Barker's testimony. Barker's second assignment of error is not well-taken.

**Third Assignment of Error**

{¶ 31} In his third assignment of error, Barker asserts that he was denied a fair trial due to prosecutorial misconduct at multiple points in the trial.

{¶ 32} The two-fold test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and whether it prejudicially affected the substantial rights of the defendant. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). Thus, a reversal for prosecutorial misconduct is not warranted unless it is clear that the outcome of the trial would have been different but for the misconduct. *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984).

{¶ 33} In his first argument under his third assignment of error, Barker contends that the state substantially prejudiced his right to due process and right to a fair trial when it "paraded the accuser and the dog before the jury in order to gain sympathy for the alleged victim in this case." In support of his argument Barker explains that prior to trial, the prosecution filed a motion in limine to allow N.S. to have her dog with her on the stand during testimony. Barker objected to the dog's exposure to the jury.

10.

{¶ 34} Barker now asserts:

While the ruling on the Motion in Limine was under advisement, and during voir dire, the State of Ohio asked N.S. and the comfort dog to wait in the hallway pending the court's ruling on the matter of the dog. The court adjourned for a break and allowed the jurors into the hallway. During this break, the jurors were exposed to the dog, and one juror even came up to pet the dog * * *. Ultimately, after prejudicially exposing the canine to the jury, the State elected to withdraw the request that N.S. be permitted to have the dog with her during testimony * * *.

{¶ 35} While trial counsel did inform the court that he "noticed that the family – the dog" was out in the hallway during a break in voir dire, counsel did not ask that the juror who petted the dog be identified or questioned. There is nothing in the record identifying the potential juror who petted the dog or whether that potential juror was selected to serve on the jury in this case. Trial counsel never requested a curative instruction and the potential jurors were never questioned about whether they saw or interacted with the dog. It is neither likely nor apparent from the record that Barker suffered any prejudice from the dog's presence in the hallway or potential juror's contact with the dog. Barker's first argument under his third assignment of error is not well-taken.

{¶ 36} In his second argument under his third assignment of error, Barker contends that the prosecutor's conduct in questioning a potential juror during voir dire,

11.

and the potential juror's responses to the questions, were prejudicial to his constitutional right to confront witnesses. Barker argues that the prosecutor was not eliciting answers to determine whether or not the prospective juror could be fair and impartial, but "to inform the broad base of prospective jurors that it was okay that the State only had N.S.'s statement, because that is not uncommon for law enforcement investigating sexual assault cases."

{¶ 37} It has long been held that the overriding purpose of voir dire is to question prospective jurors and determine whether a potential juror meets both the statutory qualification of a juror and is "free from bias or prejudice for or against either litigant." *Vega v. Evans*, 128 Ohio St. 535, 191 N.E. 757 (1934), paragraph one of the syllabus. "The character and scope of such questions * * * must be controlled by the court in the exercise of its sound discretion." *Krupp v. Poor*, 24 Ohio St.2d 123, 265 N.E.2d 268 (1970), paragraph one of the syllabus.

{¶ 38} Here, the prosecutor engaged in the following voir dire exchange:

[PROSECUTOR]: * * * Mr. Crowe, I believe you told Judge Kelsey that you have investigated sex offenses.

PROSPECTIVE JUROR: That's correct.

[PROSECUTOR]: How long have you investigated sex offenses for the Maumee Police Department?

PROSPECTIVE JUROR: Pretty much my whole career between taking general offense reports regarding allegations and then some follow-up investigation on other cases involving that type of activity.

[PROSECUTOR]: Okay, and I'm going to throw a sentence out. I'm going to ask you if you agree with it. Rape is a secretive crime. Would you agree with that sentence?

PROSPECTIVE JUROR: Rape is a secretive crime? Not always. I would not agree with it.

[PROSECUTOR]: And can you tell me why?

PROSPECTIVE JUROR: Because that particular conduct can be committed in the presence of others.

[PROSECUTOR]: Like a gang rape –

PROSPECTIVE JUROR: That's correct.

[PROSECUTOR]: -- during a party?

PROSPECTIVE JUROR: Yes.

[PROSECUTOR]: Have you ever had an occasion to investigate allegations of rape where there were only two people present?

PROSPECTIVE JUROR: Yes.

[PROSECUTOR]: As percentages how many of the reports come in with that fact pattern?

PROSPECTIVE JUROR: A small percentage.

[PROSECUTOR]: Okay. What type of evidence do you try to look for in those cases?

PROSPECTIVE JUROR: Fluid evidence type of things, other physical evidence regarding clothing, sheets, fabrics, different things like that.

[PROSECUTOR]: Okay, and have you ever dealt with delayed reporting cases?

PROSPECTIVE JUROR: Yeah.

[PROSECUTOR]: The offense occurred in the past and they finally came forward at some point in the future?

PROSPECTIVE JUROR: Yeah.

[PROSECUTOR]: Does your investigation change at all in those cases?

PROSPECTIVE JUROR: Depending on circumstances it could, but we generally – or I generally try to investigate the case as it presents itself and for evidence where – anywhere it could be, even if it is old.

[PROSECUTOR]: Have you ever investigated a case where the only evidence you had were the statements of the victim?

PROSPECTIVE JUROR: Yes.

[PROSECUTOR]: How do you assess that persons' credibility under those circumstances?

{¶ 39} At that point in the voir dire, trial counsel asked to approach the bench. A sidebar discussion was held on the record. Trial counsel objected to the line of questioning. The prosecutor asserted that it next intended to ask the prospective jurors, as a group, if they could convict "on the testimony of a single witness." The court cautioned the state that it was "getting pretty close to giving [its] opening statement." Back before the prospective jurors, the state asked the entire panel "would any of you have difficulty rendering a guilty verdict because it was just one witness?"

{¶ 40} While it is unclear exactly what the prosecutor was trying to determine about this prospective juror's qualifications, bias, or prejudice, we cannot say the conduct prejudiced Barker. The prospective juror had experience in investigating allegations of sexual assault. And, while it appears the line of questioning was headed into questionable territory, the sidebar discussion redirected the state to a permissible line of questioning before the prospective juror answered any question which prejudicially affected the substantial rights of the appellant. Accordingly, Barker's second argument under his third assignment of error is not well-taken.

{¶ 41} In his third argument under his third assignment of error, Barker asserts that the trial was rendered "fundamentally unfair" when "the Prosecutor had an apparent emotional breakdown in the presence of the jury." The following sidebar discussion is the only evidence before this court of this alleged prosecutorial misconduct:

15.

[TRIAL COUNSEL]:  I didn't object earlier, but I could not see Mr. Matuszak, I don't know if he was having a breakdown moment, he was crying or what the reaction was.

[PROSECUTOR]:  I was thinking.  I didn't want to look at her, so I was looking down at the podium.

[TRIAL COUNSEL]:  The reason I say that, if that was happening I want it reflected in the record.

[PROSECUTOR]:  Are my eyes dry?

[TRIAL COUNSEL]:  I couldn't see your face, so I didn't know what was going on.

[PROSECUTOR]:  I did not pull a Denzel Washington from the movie *Glory*.

[TRIAL COUNSEL]:  That's why I objected.  I have no other basis.

[PROSECUTOR]:  And, Mrs. Latham, your transcript does reflect the time, so that Court of Appeals upon review will be able to note."

[TRIAL COUNSEL]:  You've indicated, so I just put it on the record.  I don't know what happened.

[PROSECUTOR]:  I was trying to determine if I should pursue that line of questioning or if I should move on, seeing how the witness was reacting.

[TRIAL COUNSEL]: Recognizing that and I understood that might be the case, but still I wanted to preserve that.

[THE COURT]: So noted. Let's proceed.

{¶ 42} Upon review of the portion of the record cited by Barker, we find no evidence of the alleged "emotional breakdown." Thus, Barker's third argument under his third assignment of error is not well-taken.

{¶ 43} In his fourth and final argument under his third assignment of error, Barker asserts he was denied a fair trial because of statements made by the state both during trial and in closing argument.

{¶ 44} In regard to statements made during trial, appellant cites the following exchange between the state and appellant while appellant was on the stand during cross-examination:

[PROSECUTOR]: You're saying that you were sitting in the kitchen?

[BARKER]: Correct.

[PROSECUTOR]: Having coffee with your wife?

[BARKER]: Correct.

[PROSECUTOR]: Who will not be testifying in this case, will she?

Upon objection, the court struck the prosecutor's question from the record. During the initial jury instructions, the jurors were instructed by the court, should it order a question and answer stricken, to "disregard completely such question and answer and not consider

them for any purpose." We presume the jurors followed the trial court's instruction. We find no prejudicial error.

{¶ 45} In regard to statements made during closing argument, Barker asserts that he was prejudiced when the prosecutor asked the jurors whether Barker presented any evidence to support the "transfer theory" that male DNA could have been transferred to N.S.'s undergarments when she utilized a toilet used by other men in the home. The portion of closing argument in question provides:

> Now during questioning they would have you believe she picked it up on a toilet seat. I want to go out on a limb here and assume that one or more than one of you have sat on a toilet seat. When a little girl sits on a toilet seat what part of her body is touching that toilet seat? Here, not the waist, not the crotch. Their whole transfer theory is at best a cheap excuse. They don't have an explanation, because if they did they'd have evidence. Did they present any?
>
> * * *
>
> They could have presented it during cross-examination. They didn't present any evidence that explains how that got inside Nicole's underwear. Now there is only one set of facts here that explains it, there's the truth doesn't change.

{¶ 46} In reviewing closing arguments for prosecutorial misconduct, we view the remarks in the context of the entire closing argument. *Treesh*, 90 Ohio St.3d at 480.

During closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *Lott*, 51 Ohio St.3d at 165, 555 N.E.2d 293. By informing the jury that Barker did not produce any evidence to explain trial counsel's suggestion that the DNA could have transferred to N.S.'s underwear, improperly implied that the burden had shifted to Barker to prove that the male DNA evidence was not his.

{¶ 47} Nevertheless, earlier in its closing argument the state acknowledged that it had to prove each element of the charged offenses beyond a reasonable doubt. It then described exactly what "reasonable doubt" meant. After closing argument, the court instructed the jury that "[t]he defendant must be acquitted unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense charged in the indictment."

{¶ 48} Upon consideration of the entire closing argument, we find that the prosecutor's burden-shifting statements were improper. However, we do not believe the prosecutor's statements prejudicially affected Barker's substantial rights. Thus, Barker's fourth argument under his third assignment of error is not well-taken.

{¶ 49} In his fifth argument under his third assignment of error, Barker asserts that on multiple occasions, the prosecutor made testimonial statements about amateur radio equipment, HAM radios and police scanners that improperly suggested Barker was lying. Then, during closing argument, the prosecutor suggested Barker was not being truthful about his amateur radio knowledge.

19.

**{¶ 50}** Generally, prosecutors are entitled to considerable latitude in closing argument. *State v. Ballew*, 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996). "However, prosecutors must avoid making insinuations and alluding to matters not supported by admissible evidence." *State v. Cappadonia*, 12th Dist. Warren No. CA2008-11-138, 2010-Ohio-494, ¶ 53. Here, we find the prosecutor's testimonial statements during cross-examination were improper.

**{¶ 51}** We cannot see prejudicial impact on Barker's substantial rights from the prosecutor's remarks, singly or collectively. Furthermore, as stated above, the trial court properly instructed the jury that counsel's closing arguments were not to be considered evidence in the case. Thus, Barker's fifth argument under his third assignment of error is not well-taken.

**Fourth Assignment of Error**

**{¶ 52}** In his fourth assignment of error, Barker asserts that the trial court abused its discretion when it allowed improper evidence before the jury.

**{¶ 53}** The admission or exclusion of relevant evidence lies within the sound discretion of the trial court. *State v. Robb*, 88 Ohio St.3d 59, 68, 723 N.E.2d 1019 (2000). Consequently, a trial court's ruling as to the admissibility of evidence will not be reversed absent an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable,

20.

arbitrary, or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 54} In his first argument under his fourth assignment of error, Barker alleges the trial court abused its discretion when the state was allowed to bolster N.S.'s credibility by introducing impermissible evidence of N.S.'s character for truthfulness.

{¶ 55} Under Evid.R. 608(A)(2), evidence of a witness's truthful character is admissible only after the character of the witness has first been attacked "by opinion or reputation evidence or otherwise."

{¶ 56} Here, the state was permitted, over trial counsel's objection, to elicit testimony from N.S.'s mother that N.S. had never lied to her about anything "of this magnitude." The state continued asking about N.S.'s character to tell the truth in the following exchange:

> [PROSECUTOR]: Whether or not homework was done, for an example?
>
> [MOTHER]: Yes.
>
> [PROSECUTOR]: Little things? Had she ever come to you, presented herself the same way she did at the hospital?
>
> [MOTHER]: No.
>
> [PROSECUTOR]: Crying and fearful and told you a lie?

21.

[MOTHER]: Never.

[PROSECUTOR]: Has she done it since?

[MOTHER]: No.

{¶ 57} Barker argues that the admission of this testimony was an abuse of discretion because N.S.'s character for truthfulness had not been attacked by opinion or reputation evidence or otherwise. In response, the state asserts that Barker's trial counsel "opened the door" when he questioned N.S. upon cross-examination about whether she reliably remembered what happened.

{¶ 58} In *State v. Ponce*, 10th Dist. Franklin No. 95 APA 11-1450, 1996 Ohio App. LEXIS 4552 (Oct. 10, 1996), the Tenth District Court of Appeals addressed a similar challenge in an appeal from a rape conviction. In *Ponce*, the state was permitted, over the defendant's objection, to elicit testimony from the victim's teacher that the victim had a reputation for honesty. The defendant argued that the testimony was improper because the victim's character for truthfulness had not been attacked by opinion or reputation evidence or otherwise. The state responded that the defense had attacked the victim's credibility in its opening statement and on cross-examination, and it was, therefore, entitled to put on evidence of the victim's character for truthfulness.

{¶ 59} The *Ponce* court rejected the state's argument finding:

Although the defense questioned [the victim's] veracity in both its opening statement and on cross-examination, it did not attempt to show that she was a dishonest person by the admission of opinion or reputation evidence of

her dishonesty or untruthfulness. Vigorous cross-examination or opening statements do not constitute the type of attack upon a witness' character for truthfulness envisioned by Evid.R. 608(A)(2) * * *. Accepting the state's argument would essentially read Evid.R. 608(A)(2) out of existence by permitting the veracity of any witness whose version of the facts are in dispute to be bolstered by evidence of truthful character. (Citations omitted.) *Id*. at *19.

{¶ 60} Here, prior to mother taking the stand, trial counsel questioned N.S.'s memory of what happened during her own cross-examination, trial counsel did not attempt to show that N.S. was a dishonest person by the admission of opinion or reputation evidence of her dishonesty or untruthfulness. Thus, the trial court did err when it allowed the prosecutor to ask mother about N.S.'s character for truthfulness.

{¶ 61} We must next consider whether the trial court's error in allowing the testimony was prejudicial or harmless. *State v. Davis*, 44 Ohio App.2d 335, 343, 338 N.E.2d 793 (8th Dist.1975). Under the "harmless error" rule, a judgment will not be reversed if the error does not affect substantial rights of the defendant. Crim.R. 52(A). This language has been interpreted to mean that the error must materially prejudice the complaining party. *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7. To be prejudicial, an error must have affected the outcome of the trial proceedings. *Id.*

23.

{¶ 62} Upon careful consideration, we conclude that the testimony did not affect the outcome of the trial proceedings.  Thus, it was harmless error.  Barker's first argument under his fourth assignment of error is not well-taken.

{¶ 63} In his second argument under his fourth assignment of error, Barker asserts that the prosecutor made various testimonial statements during appellant's cross-examination regarding amateur radio equipment and then used those statements to impermissibly challenge Barker's credibility during closing argument.  The relevant portion of the transcript provides, as follows:

[PROSECUTOR]:  Okay.  What kind of rig do you have? You don't know what kind of rig you have?  Tell me the manufacturer.

* * *

[BARKER]:  Well, I can't.  I can't think of it right this second.

[PROSECUTOR]:  Is it Yaeso?  Is it Icom?

[BARKER]:  Come on.  I can tell you what all my rigs are and I haven't touched them in years.

* * *

[PROSECUTOR]:  So, you're running 440 and –

[BARKER]:  Two meters.

[PROSECUTOR]:  -- and two meters?  That's a typical dual bander.  You don't have the tri banders?

[BARKER]:  I have a quad and a two.

24.

During closing argument the prosecutor asserted:

> [Barker] drew the short straw having the prosecutor who might know a little bit about what he thought he was an expert on.
>
> * * *
>
> If anybody here has ever had a HAM radio license, talked about a HAM radio operator, they will be able to tell you what their rig is, from the antenna down to the resistance in the lines, fine cables, yeah. So, 10897, runs all bands, including 60 meters. They know that stuff.
>
> * * *
>
> Ladies and gentlemen, did it look to you like [Barker] got caught in a lie, he was trying to make stuff up, and when asked a very simple question for somebody who claims to hold a general license couldn't answer it? That was an oops moment for him. Oh, crap, I was trying to blow smoke.

{¶ 64} It has long been held that "[p]rosecutors are entitled to wide latitude in closing argument as to what the evidence has shown and what inferences may be drawn therefrom." *State v. Cappadonia*, 12th Dist. Warren No. CA2008-11-138, 2010-Ohio-494, ¶ 53. (Citation omitted.) "However, prosecutors must avoid making insinuations and alluding to matters not supported by admissible evidence." *Id.*

{¶ 65} Above, we found the prosecutor's testimonial statements during cross-examination were improper. Here, we find that the prosecutor's insinuations, based upon

25.

the testimonial statements, were erroneous.  However, in the context of the entire trial, we do not find that the prosecutor's insinuations prejudiced the appellant.  Therefore, Barker's second argument under his fourth assignment of error is not well-taken.

## Conclusion

{¶ 66} For the reasons set forth above, the judgment of the trial court is affirmed. The costs of this appeal are assessed to appellant under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Thomas J. Osowik, J.

James D. Jensen, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE