[Cite as *State v. McNeal*, 2019-Ohio-2941.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28123 |
| | : | |
| v. | : | Trial Court Case No. 2014-CR-3409 |
| | : | |
| TRACY K. MCNEAL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of July, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

CRAIG M. JAQUITH, Atty. Reg. No. 0052997, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** Tracy K. McNeal appeals from his conviction of rape of a substantially impaired victim, with a repeat violent offender specification, for which he was sentenced to 11 years for the rape offense plus nine years for the attached specification, for an aggregate prison term of 20 years. The judgment of the trial court will be affirmed.

### Factual and Procedural Background

**{¶ 2}** In October 2014, a Montgomery County grand jury indicted McNeal for two counts of rape (substantially impaired victim) in violation of R.C. 2907.02(A)(1)(c), a first-degree felony, with a repeat violent offender specification attached to the second count. The two counts related to offenses against different victims, one in 2009 and one in 2014, and were severed for purposes of trial.

**{¶ 3}** McNeal's first trial on Count Two ended in a mistrial. In October 2016, the case proceeded to a second jury trial on that count. During that trial, the Count Two complainant, then-23-year-old C.R., testified that when she was about 16, McNeal and his wife, Leesa, lived for about a year across the street from C.R., her mother, her sister ("Sister"), and Sister's husband ("Brother-in-Law"). The families became friends, and C.R. stayed in touch with Leesa after both families moved.

**{¶ 4}** In September 2014, C.R. permitted McNeal, Leesa, and their four children[1] to move temporarily into C.R.'s two-bedroom, one-bathroom apartment with C.R. and her three-year-old son. C.R. and her son shared one bedroom while the McNeals all stayed in the other bedroom. Sister and Brother-in-Law lived in the apartment next door with their three children.

---

[1] According to C.R., at that time, the McNeals' children were one, two, four, and 13 or 14 years old.

{¶ 5} According to C.R., on September 29, 2014, C.R., Sister, Brother-in-Law, McNeal, and Leesa decided to drink together. They went to a liquor store where C.R. bought herself "a little bottle of Ciroc" and the others "all went in on a half-gallon of vodka." (Transcript ("Tr."), p. 233.) The five began drinking in C.R.'s living room at about 7:00 to 7:30 p.m., while C.R.'s son was asleep in the bedroom he and C.R. shared and three of the McNeals' children were asleep in the other bedroom.[2] C.R. "drank the whole bottle" she had purchased "plus quite a bit" of the other bottle, as McNeal was encouraging C.R. and Leesa to drink shots. (*Id.*, p. 244.) C.R. "probably" smoked marijuana that night as well (*id.*, p. 239), and was taking Klonopin for anxiety. (*Id.*, pp. 274-275.)

{¶ 6} C.R. said she consumed more alcohol than she normally would. After maybe an hour and a half of drinking, she "just got drunk so quick" and "ran to the bathroom and started throwing up." After that, she "[v]aguely" recalled "bits and pieces" from the rest of the evening. (*Id.*, p. 232.) C.R. remembered Sister and Leesa changing C.R.'s clothes, carrying her to her bedroom, and placing her on her bed on her stomach with a trash can near her head. C.R.'s son was asleep on the other side of the bed.

{¶ 7} Asked what happened next, C.R. testified:

I was knocked out. I was really, really drunk. Really, really drunk. I don't remember too much. I was so drunk that I couldn't even help myself. I couldn't – I didn't know what I was doing. * * * I was that drunk.

(Tr., p. 249.)

{¶ 8} At some later point, however, C.R. felt herself "being yanked on to the bottom of the bed," roughly and by her feet. (*Id.*, p. 250.) She testified that she first thought it was

---

[2] C.R. said the McNeals' oldest child was not in the apartment at that time.

her boyfriend, who had a key to the apartment. Her testimony continued:

> * * * I was so drunk I really couldn't – I was just laying [sic] there like I couldn't stop anything. I couldn't say yes. I couldn't say no. * * *
>
> * * *
>
> And then, I remember getting flipped over and then, I rem – I don't really remember too much after that. I know I was in and out, in and out, in and out like I was unconscious for a second for say [sic]. And then, it – I would just keep going in and out like I couldn't stay[ ] * * * [i]n my right mind.
>
> * * *
>
> I remember when I was flipped over, which would have made me be on my back at that time * * * I remember getting yanked closer but like I said I – it was in and out. So I don't really remember. When I came to I seen [sic] my sister.
>
> * * *
>
> And I said, [Sister], was somebody just in here? And she said, yeah. I said who? She said [McNeal]. I said, [Sister], he just f* * *ing raped me.

(Tr., pp. 250-251.)

{¶ 9} Despite her inability to recall details of the incident, C.R. said that she knew she had been raped because "being a woman, when I have intercourse, I get like wet and sticky down there * * * And that's what I was feeling. * * * And I knew that I didn't do anything." (*Id.*, p. 252.) Sister suggested that they go to Sister's apartment to call the police; C.R. asked Sister to carry C.R.'s son. C.R. stated that on the way there, she "was in a lot of pain in [her] vaginal area"; she described it as "stabbing pain." (*Id.*, pp. 254,

255.)

**{¶ 10}** After the police and medics arrived, C.R. went to the hospital for a sexual assault examination. C.R. described her pain to the examining nurse. She also consented to a police search of her apartment. Asked on cross-examination if she remembered being penetrated, C.R. responded, "I can't answer that 'cause I don't know. I was in and out." (*Id.*, p. 276.)

**{¶ 11}** Sister offered similar testimony. Sister said her family knew McNeal and Leesa as former neighbors, and when McNeal and Leesa wanted to return to Ohio, C.R. permitted them to temporarily move into her apartment with their four children. Using photographs, Sister described C.R.'s apartment as it appeared on September 29, 2014. That evening, Sister and her children went over to C.R.'s apartment, where C.R., Leesa, McNeal, and Brother-in-Law (Sister's husband) already had been drinking vodka. Sister left to put her children to bed in her own apartment, then returned to C.R.'s and began drinking with the group. After Sister drank a few shots, C.R. "started to get sick"; "at this point she's in the bathroom puking and urinating on herself." (Tr., p. 495.) Sister and Leesa "cleaned [C.R.] up, change[d] her clothes and put her in bed" on her side, with a trashcan next to the bed. (*Id.*, pp. 495-496.) Sister went back to the living room with the group, but continued to check on C.R. about every 15 minutes.

**{¶ 12}** After an hour and a half or so, Sister went to her own apartment to eat a sandwich and go bed. As she was finishing the sandwich, Brother-in-Law came home "really drunk" and "started an argument." (*Id.*, p. 501.) After 10 or 15 minutes, Sister left to find McNeal, to ask him "to try to calm [Brother-in-Law] down."

**{¶ 13}** When Sister entered C.R.'s apartment, no one was in the living room.

Calling McNeal's name, Sister headed back to the darkened hallway toward the bedrooms. She flipped on a light and again called McNeal's name. "And next thing I know [McNeal]'s standing in [C.R.'s] bedroom doorway, not dressed around his waist, he's got clothes around his ankles and kind of shocked me." (*Id.*, p. 502.) According to Sister, McNeal was naked from the waist down, and she saw "part of his penis." Sister continued:

> [McNeal] was out of breath, red, and his face was red, and he was real sweaty. And he looked at me and said, "My bad, me and Leesa are in here doing some freaky shit."
>
> * * *
>
> [The bedroom door] was being pulled shut like he was trying to hide what was in there. * * * I couldn't see anything inside the room, but I could see * * * that it was dark.

(*Id.*, p. 503.)

**{¶ 14}** Sister testified that she hurried away and returned to her own apartment. Once there, however, she realized that McNeal had not been standing in the doorway of the bedroom where he, Leesa, and their children were staying, but instead had been standing in the doorway of C.R.'s bedroom. Sister was attempting to convince her intoxicated husband (Brother-in-Law) to return to C.R.'s apartment with her when McNeal walked into Sister's apartment and asked what she wanted. Sister asked McNeal to calm Brother-in-Law down, then left to go back to C.R.'s apartment. She testified:

> I walked straight back to [C.R.]'s bedroom, and I whispered for Leesa[;] I said, "Leesa are you in here?" And I hear, "(Sister's name)," and I could tell it was [C.R.] and not Leesa, and I flipped on the light and she's

sitting and her face is red. She's got tears coming down her cheeks, and she asked me who was just in [the] bedroom. And I told her [McNeal] was. And panic sets in, she like starts gasping for – not gasping for air, panting, she's out of breath. She's complaining her chest hurt, and told me, "That motherf* * *er was in here f* * *ing me while I was asleep."

(*Id.*, pp. 505-506.)

{¶ 15} Sister then took C.R. and C.R.'s son back to Sister's apartment, where C.R. called another friend to tell her that C.R. had been raped. That friend called the police.

{¶ 16} Officer Anthony Sawmiller of the Dayton Police Department was dispatched to Sister's apartment in response to a reported assault. Officer Sawmiller testified that he found C.R. there, "somewhat hysterical and crying."[3] She appeared to be intoxicated. C.R. reported that she had been raped by McNeal. Sister also was there, and did not seem intoxicated, but was upset.

{¶ 17} After medics arrived, Officer Sawmiller proceeded to C.R.'s apartment, where McNeal and Leesa were seated in the living room. McNeal "seemed a little nervous," but claimed that "nothing" had happened. McNeal indicated that a number of people had been drinking and smoking marijuana in the apartment when C.R. became sick and vomited. McNeal also reported that C.R. and Sister had gotten into an argument about Brother-in-Law doing something that Sister considered "inappropriate." McNeal said that he had "tried to have sex with his wife" that night, but gave different accounts as to which bedroom was his. According to Officer Sawmiller, Leesa tried to interject while

---

[3] Officer Kevin Cooper, who also responded to the scene, described C.R. as "a little intoxicated" and "crying uncontrollably"; "[w]e thought she was going to hyperventilate, she was breathing so heavy." (Tr., pp. 570-571.)

McNeal was talking, but McNeal "continually interrupted her." After three or four interruptions, Leesa left the apartment. Based on the interviews conducted at the scene, police officers placed McNeal under arrest.

{¶ 18} About an hour and a half after arriving at the scene, Officer Sawmiller went to the hospital, where he found C.R. seeming "calmer" and less intoxicated. C.R. complained of pain in her vaginal area.

{¶ 19} Bobbie Jo Rosell, the nurse who conducted C.R.'s sexual assault exam, testified that upon arriving at the hospital on the morning of September 30, 2014, C.R. was "alert," "oriented," and "able to give * * * a narrative in regards to what had happened that night." (*Id.*, p. 313.) Rosell said C.R. told her that C.R. "had some issues remembering" the event. (*Id.*, p. 315.) C.R. reported waking up and hearing Sister's voice. C.R. then realized that her right breast "was hanging out from underneath her shirt and * * * she did not have anything on from her waist down." (*Id.*, pp. 315-316.) C.R. reported she "felt like she was wet down in her vaginal area and she was having a lot of pain and discomfort"; C.R. said she "just didn't feel right or she fe[lt] weird." (*Id.*, p. 316.) However, C.R. could not recall having been penetrated by a penis or fingers. (*Id.*, p. 316.)

{¶ 20} Rosell collected swabs from various places on C.R.'s body, including her rectal area. Rosell said that she did so because, if a woman has a sexual encounter while lying on her back, "there's possibly trace DNA that flowed from her vaginal opening down to the rectal area." (*Id.*, pp. 327-328.) Rosell testified that C.R.'s complaints of pain "were consistent with a sexual encounter" (*id.*, p. 329); "you don't have pain at the posterior fourchette[4] unless something is trying to enter that area." (*Id.*, pp. 331-332.)

---

[4] Rosell identified the "posterior fourcette" as being "at the base of the vagina;" "it's going

{¶ 21} Crime Scene Investigator ("CSI") John Malott of the Dayton Police Department testified about gathering evidence at C.R.'s apartment. With McNeal's consent, he first collected a DNA swab from McNeal's cheek. Malott also collected the bedding from C.R.'s bed and the sexual assault kit performed on C.R. from the hospital. Further, CSI Malott identified photographs he took inside C.R.'s apartment on the morning of September 30, 2014.

{¶ 22} Forensic scientist Mary Cicco of the Miami Valley Regional Crime Laboratory testified as an expert in serology and DNA. Cicco testified that she performed DNA testing on the swabs taken from McNeal's cheek and from C.R.'s body. The rectal swabs obtained from C.R. tested positive for semen, but contained no sperm cells. Through further testing, Cicco determined that "very little male DNA" was present, allowing her to develop "a minimal DNA profile" consisting of three of 15 possible markers. Those three markers matched McNeal's DNA profile. Cicco testified that one in 2,947 Caucasian males would match those three markers.

{¶ 23} For further comparison, Cicco also performed a different test for male-specific DNA, known as Y-STR testing, on the semen sample. According to Cicco, although she could not say that McNeal specifically was the source of that sample, the Y-STR testing showed that the semen came from a member of McNeal's biological family. Out of 16 different markers used for such testing, Cicco found six, all of which matched McNeal. Cicco testified that one in 382 Caucasian males would match the six markers found on the second test. She stated her opinion as follows:

---

to be that tissue that's right at the base of the vaginal opening." (Tr., pp. 330-331.) C.R. complained of pain in that location. (*Id.*, pp. 328, 331.)

It is my opinion that the male DNA profile that I obtained from the rectal swabs matches back to Tracy McNeal with the statistics that are provided in the report that he cannot be excluded based on these statistics of finding a random individual that could possibly be that contributor as well.

(Tr., p. 449.)

{¶ 24} On cross-examination, Cicco acknowledged that the testing she performed did not conclusively establish that McNeal was the contributor of the semen found on C.R.'s rectal swab.

{¶ 25} The defense called Brother-in-Law, who testified that he did not witness McNeal do anything inappropriate to C.R. on the night of September 29, 2014. On cross-examination, however, Brother-in-Law acknowledged that he had been quite drunk and remembered little from that night. He also indicated that he remembered Sister coming home and telling him that she had seen McNeal come out of C.R.'s bedroom "with his pants down." (Tr., p. 611.) In addition, in an attempt to highlight perceived inconsistencies in C.R.'s statements about the incident, including as to the quantity of alcohol that she consumed on the night in question, defense counsel called a detective involved in investigating C.R.'s allegations.

{¶ 26} Defense counsel called James Quinn to testify, but when the trial court sustained two objections by the State during Quinn's direct examination, Quinn was excused without the jury's hearing Quinn's testimony about C.R.'s relationship with Leesa. On the record, but outside the jury's presence, McNeal waived his right to testify. Thereafter, also without the jury present, the defense proffered Quinn's testimony that had been excluded by the trial court.

{¶ 27} The jury found McNeal guilty of rape of a substantially impaired victim. The trial court subsequently found McNeal guilty of the repeat violent offender specification, and sentenced him to 11 years for the rape offense plus nine years for the attached specification, for total of 20 years in prison.

{¶ 28} This court dismissed McNeal's first appeal from that judgment, finding that the termination entry was not a final appealable order because it failed to address the disposition of Count One. (Decision & Final Judgment Entry, *State v. McNeal*, 2d Dist. Montgomery No. 27371, May 21, 2018.) The trial court then filed an amended termination entry, indicating that Count One had been dismissed.

{¶ 29} McNeal brings this timely appeal from the amended judgment, setting forth four assignments of error:

1) The trial court erred when it improperly excluded testimonial evidence establishing that Mr. McNeal's accuser had a motive to falsely accuse Mr. McNeal of rape.

2) Mr. McNeal's trial counsel rendered ineffective assistance of counsel, in violation of his constitutional rights.

3) Mr. McNeal's due-process rights were violated when the trial court entered a conviction for rape in the absence of sufficient evidence.

4) Mr. McNeal's conviction for rape is against the manifest weight of the evidence[.]

(Citations omitted.) (Merit Brief of Tracy K. McNeal, pp. v-vi.)

### *Assignment of Error #1 – Improper Exclusion of Evidence*

{¶ 30} McNeal contends that the trial court erred by refusing to admit James

Quinn's testimony that, prior to the date of the alleged rape, Quinn heard and saw C.R., McNeal's accuser, repeatedly express interest in having a sexual relationship with Leesa, McNeal's wife. McNeal urges that the trial court improperly relied on Ohio's rape shield law to exclude that extrinsic evidence of C.R.'s motive to falsely accuse McNeal of rape, and further suggests that the court "wholly ignored constitutional provisions"[5] as well as Evid.R. 616(A) in so ruling.

### a. Standard of Review

**{¶ 31}** Because a trial court exercises discretion in deciding whether to exclude or admit evidence, we ordinarily review such decisions under an abuse of discretion standard. *State v. Graham,* 58 Ohio St.2d 350, 390 N.E.2d 805 (1979); *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19. However, when a criminal defendant claims that an evidentiary decision violated his or her constitutional rights, such as those under the Confrontation Clause, a de novo standard of review applies. *State v. Mitchell*, 2016-Ohio-1439, 62 N.E.3d 820, ¶ 77 (7th Dist.).[6]

### b. Ohio's Rape Shield Statute and the Confrontation Clause

**{¶ 32}** Ohio's rape shield statute provides in pertinent part as follows:

(D) Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it

---

[5] Although his brief lists the Fifth and Fourteenth Amendments to the U.S. Constitution as support for this assignment of error (Merit Brief of Tracy McNeal, pp. i, v, 7, 10), McNeal never identifies what particular constitutional right he claims was violated by the trial court's exclusion of evidence. (*See id.*, pp. 7-10.)

[6] McNeal advances only the "abuse of discretion" standard of review in his appellate brief. (*See* Merit Brief of Tracy McNeal, pp. 7, 8.)

involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

* * *

(E) Prior to taking testimony or receiving evidence of any sexual activity of the victim * * * in a proceeding under this section, the court shall resolve the admissibility of the proposed evidence in a hearing in chambers, which shall be held at or before preliminary hearing and not less than three days before trial, or for good cause shown during the trial.

R.C. 2907.02.

{¶ 33} R.C. 2907.02(D) "essentially prohibits the introduction of any extrinsic evidence pertaining to the victim's sexual activity unless it involves evidence of the origin of semen, pregnancy, or disease, or of the victim's past sexual activity with the offender." *State v. Williams,* 21 Ohio St.3d 33, 34, 487 N.E.2d 560 (1986). "Even if one of the foregoing exceptions applies, introduction of such evidence is permitted only if the court finds that the evidence is material to a fact at issue and that its prejudicial nature does not outweigh its probative value." *In re Michael,* 119 Ohio App.3d 112, 118, 694 N.E.2d 538 (2d Dist.1997), citing R.C. 2907.02(D).

{¶ 34} "Application of the rape shield law may not, however, unduly infringe upon a defendant's constitutional rights." *Id.* "The Confrontation Clause of the Sixth Amendment to the United States Constitution gives the accused the right to be confronted

with the witnesses against him." *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 83. Even so, "[t]he rights to confront witnesses and to defend are not absolute and may bow to accommodate other legitimate interests in the criminal process." *State v. Boggs,* 63 Ohio St.3d 418, 722, 588 N.E.2d 813 (1992).

{¶ 35} "In determining whether the rape shield law would unconstitutionally infringe on a defendant's rights, a court must 'balance the state interest which the statute is designed to protect against the probative value of the excluded evidence.' " *State v. Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 66, quoting *State v. Gardner,* 59 Ohio St.2d 14, 17, 391 N.E.2d 337 (1979). *Accord State v. Hennis,* 2d Dist. Clark No. 2003 CA 21, 2005-Ohio-51, ¶ 48. The Ohio Supreme Court has recognized that "[s]everal legitimate state interests are advanced by the [rape] shield law," namely:

> First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.

(Footnote omitted.) *Gardner* at 17.

{¶ 36} On the other side of the scale, "[t]he key to assessing the probative value of the excluded evidence is its relevancy to the matters as proof of which it is offered." *Gardner* at 18. " 'Cases decided since *Gardner* * * * have established that in order for the contested evidence to be admissible, it must be submitted for a more important purpose

than mere impeachment of a witness's credibility.' " *State v. Hicks*, 2d Dist. Montgomery No. 17730, 2000 WL 646505, *4 (May 19, 2000), quoting *In re Michael*, 119 Ohio App.3d 112, 119, 694 N.E.2d 538. *Accord Hennis* at ¶ 52 ("impeaching a witness's credibility is an insufficient reason for admitting evidence that violates the Rape Shield Law").

**{¶ 37}** Only a few Ohio appellate cases appear to have examined the interplay between the Rape Shield Law and the Confrontation Clause in instances where the defendant claimed that the victim's past sexual activities would show that the victim or another key prosecution witness had a motive to fabricate evidence against the defendant. In what appears to be the only such case out of this court, we concluded that the defendant had failed to demonstrate that the witness (the victim's mother) had reason to know of a possible motive for her to fabricate evidence. *See Michael* at 125. Two opinions from other courts likewise concluded that the contested evidence had little or no probative value, and such decisions thus provide little guidance as to the balancing of the State's interest in protecting rape victims against a defendant's interest in presenting evidence of sexual conduct by the victim that could be probative of the defendant's guilt or innocence. *See State v. Stepp*, 12th Dist. Butler No. CA2007-05-117, 2008-Ohio-4305, ¶ 52-54 (connection between victim's affair with her former probation officer and her accusation against defendant was "tenuous * * * at best" and "unlikely" to outweigh interests protected by rape shield law); *State v. King*, 8th Dist. Cuyahoga No. 76925, 2000 WL 1876398, *8 (Dec. 18, 2000) (Kilbane, J., concurring) (even if victim's "juvenile record contained evidence of * * * 'improper sexual activities,' " still properly excludable under rape shield provisions).

**{¶ 38}** Although not directly on point, one remaining example provides a more

substantive analysis of the competing interests between rape shield protection and a defendant's confrontation rights. *See State v. Johnson*, 4th Dist. Ross No. 16CA3579, 2017-Ohio-7257. In *Johnson*, the Fourth District Court of Appeals concluded that the defendant's confrontation right did not warrant admission of evidence about the child victim's sexual activity in order to show that the victim had a "motive to lie." There, defendant Johnson's attorney argued in his opening statement that the victim (the daughter of Johnson's girlfriend) had fabricated rape allegations against Johnson in retaliation for Johnson's punishing the victim after discovering that she was sexually active. *Id.* at ¶ 5. The trial court granted a mistrial and set the matter for a new trial. *Id.* at ¶ 6-7.

**{¶ 39}** On appeal, the appellate court stated:

* * * Johnson claimed that the evidence of the child's specific sexual activities – that she told him she had sex with an "African American" boy while on vacation, that he found messages to boys on her cell phone and tablet computer talking about being friends "with benefits," performing "blow jobs" in the back of the bus, and including pictures containing inappropriate images – was probative evidence because it led to the decision to discipline the victim by taking her phone and tablet away from her. In turn, that prompted the child to retaliate by making up the rape charges against Johnson. That is, he argued that this evidence was necessary to establish the child's bias against Johnson and provided a motive for her to falsely accuse him.

*Id.* at ¶ 22. The Fourth District opined that "even if * * * Johnson's evidence of the child's

prior sexual activities had some probative value in explaining a motive to lie about Johnson, the trial court did not abuse its discretion in determining that any probative value of the specific graphic conduct was outweighed by the several state interests supporting application of the rape shield law." *Id.* at ¶ 24.

**{¶ 40}** In addition, the appellate court faulted Johnson for "fail[ing] to give any notice before trial," in accordance with R.C. 2907.02(E), "that he would introduce this evidence," which "would have allowed the court to address the issue in chambers outside the hearing of the jury." *Id.* at ¶ 25. The appellate court reasoned:

Had defense counsel provided proper notice, the court would have had the opportunity to allow Johnson to introduce less specific, less graphic nonsexual and sexual evidence of bias, i.e., that the child engaged in inappropriate sexual conduct, her use of marijuana while on vacation and messaging inappropriate things to boys without detailing their inflammatory and potentially racially charged nature. In other words here the devil is in the details, which could have been avoided if defense counsel had provided notice. Prior notice could have permitted Johnson to introduce evidence of bias and a motive for the child victim to falsely accuse him without making a mockery of the rape shield law, yet still protecting his right of confrontation.

*Id.*

**{¶ 41}** The court in *Johnson* cited a case in which another Ohio appellate court rejected a similar confrontation claim, where "compelling nonsexual evidence of bias on the part of the victim [was] before the jury and * * * the defendant could have explored the evidence more thoroughly in a pretrial evidentiary hearing under R.C. 2907.02(E), but did

not." *Id.*, citing *State v. Pennington*, 10th Dist. Franklin No. 91AP-13, 1991 WL 476699, *6-8 (July 30, 1991). Observing that "the rape shield law manifestly prohibited" references to the victim's sexual activities," the Fourth District further concluded that "the trial court properly determined that [Johnson's] constitutional right to confrontation did not warrant the admission of this evidence" *Id.* at ¶ 26.

### c. Analysis of McNeal's First Assignment of Error

#### i) The Trial Court's Specific Evidentiary Rulings

**{¶ 42}** Prior to trial, the State filed a motion in limine asking the trial court to apply the rape shield law to exclude any evidence "offered as to [C.R.]'s prior sexual activities." (Tr., p. 62.) During a pretrial hearing on that motion, the State stated that McNeal intended to argue that C.R. "had romantic feelings for" Leesa, allegedly giving C.R. a "motive to * * * work[ ] with * * * Leesa to plant [DNA] evidence, potentially, on [C.R.]." (*Id.*, p. 63.) The State characterized that defense theory as "try[ing] to dirty up the victim," and suggested that "if the Defense wants to present some kind of motive that [C.R.] and Leesa were working together, the[ir] friendship is the only thing that there's evidence of." (*Id*

**{¶ 43}** Defense counsel responded that James Quinn was prepared to testify that he "saw inappropriate sexual touching between" C.R. and Leesa and heard "inappropriate sexual statements between the two," including "your kids and wife will be mine" and "[w]e're going to get you pink slipped."[7] (*Id.*, p. 64.)[8] Defense counsel urged that such

---

[7] McNeal's appellate brief asserts that the "pink slipped" reference meant that C.R. "intended to get Mr. McNeal committed for mental-health issues." (Merit Brief of Tracy McNeal, p. 9.) That explanation of the term does not appear in Quinn's proffered testimony or elsewhere in the trial record, however.

[8] Defense counsel indicated that McNeal was present when such statements were made (Tr., p. 65), suggesting that the statements about "your kids and wife" and "get[ting] you

evidence "goes [ ]to motive, bias," and "speaks to the potential of these two women to set [McNeal] up in this matter"; "I think that trumps the rape shield statute." (*Id.*, pp. 64-65.) The transcript then records the following dialogue:

[Trial Court]: Is the evidence you intend on showing * * * that there was * * * sexual activity or potential sexual activity between the victim and the Defendant's wife[?] Is that where you're going with this?

[Defense counsel]: Yes[.] * * *

* * *

[Trial Court]: Well, what the Court is going to do and I understand the law of this matter to mean that any evidence regarding a specific incidence of the [victim]'s sexual activity * * * [is] inadmissible unless * * * it comes under one of a few exceptions. And I really haven't heard those exceptions [here], evidence involving the origin of semen, pregnancy, disease, evidence of past sexual activity with the [defendant]. There is no evidence that the Defendant had any past sexual activity [with the victim] and I think what you're trying to do is attack the credibility of the victim more so than anything else. And I think that's improper.

Now with that said, I agree with the State that you should be given some leeway if you're trying to establish some reason here within the bounds of friendship, relationship, motive, and so forth. But I think if you're going to get into alleging sexual activity between the victim and another individual[, that] would fail under the rape shield law. So I'm not going to

pink slipped" were directed to McNeal.

allow it.

It is hard for me to say right now that I'm going to preclude you entirely and I'm not saying that * * *. But I just don't want to go down a path where we're throwing allegations out just to prove the victim was a bad person in this case. This is not a case where – well, the issue here is whether or not the victim was substantially impaired and consented to the sexual activity.

And I think that's the underlying issue that the jurors must determine. And I think that allowing anything additional to that would muddy the waters. So I'm ordering you to stay away from any sexual innuendos concerning the victim and the Defendant's wife or others. I will allow you to go down the path of other relationships, friendships and possible motives and so forth.

So it's hard for me to say every question I would sustain or overrule. I don't know right now but that's my general ruling on the motion in limine presently. And if anything happens during the trial or its gets a little close to this issue, I would just ask [c]ounsel to raise the objection and we'll deal with it at that point in time.

But I'm not going to allow any testimony, evidence, or comments concerning the victim's sexual activity with others pursuant to the rape shield law.

(Tr., pp. 66-68.)[9]

---

[9] At no time during that hearing did defense counsel claim that Quinn's proposed testimony would not fall under the rape shield law, nor did he assert a Confrontation Clause or other constitutional challenge at that time.

**{¶ 44}** During trial the following day, when the defense called Quinn to testify before the jury, the State immediately raised an objection, leading the trial court to caution defense counsel to avoid questioning that would evoke rape shield law concerns. (Tr., pp. 616-618.) Early in his direct examination, defense counsel requested a sidebar to advise the court that he intended to ask Quinn about C.R.'s alleged statement "that she would take [McNeal's] wife and kids away from him." (*Id.*, p. 620.)The trial court sustained the State's hearsay objection. The court also sustained the State's relevancy objection to Quinn's proposed testimony about seeing C.R. and Leesa together after McNeal's arrest. (*Id.*, pp. 620-621.) Defense counsel then excused Quinn without eliciting further testimony.

**{¶ 45}** After resting its case, and outside the jury's presence, the defense proffered additional testimony by Quinn. (*Id.*, pp. 639-646.) Quinn stated that he had known McNeal, Leesa, and C.R. for several years. Quinn denied having heard C.R. say anything about taking McNeal's children. (*Id.*, p. 640.) However, Quinn said that before C.R. accused McNeal of rape, Quinn had heard C.R. state that she "was going to get [McNeal] pink slipped" and that "Leesa was going to be [C.R.]'s girlfriend." (*Id* According to Quinn, C.R. also would "grab" Leesa's chest and buttocks, refer to Leesa as "baby mama," talk about living with Leesa, and "mak[e] jokes" about performing oral sex on Leesa. (*Id.*, pp. 644.) Quinn took such "joking" seriously. Further, Quinn testified that he had heard C.R. say, in McNeal's and Leesa's presence, that C.R. was "going to get Victim of Crime money." (*Id.*, pp. 641-642.) He said that C.R. made that statement both before and after McNeal was arrested, and that he saw Leesa and C.R. together twice after McNeal's arrest. (*Id.*, p. 642.)

ii)       McNeal's Evidentiary Error Claim

**{¶ 46}** After reviewing the record as outlined above, we are unable to conclude that the trial court abused its discretion in its evidentiary rulings regarding James Quinn's proposed testimony about the relationship between C.R. and McNeal's wife, Leesa. In its provisional ruling on the State's motion in limine, the trial court restricted McNeal only from presenting evidence about "sexual innuendos concerning the victim and the Defendant's wife." (*See* Tr., p. 67.) In so ruling, the court stated explicitly that it would give McNeal's attorney "some leeway" to try to establish C.R.'s "possible motives" to fabricate, but without delving into "the victim's sexual activity with others," in derogation of the rape shield law. (*Id.*, pp. 67-68.)

**{¶ 47}** During Quinn's direct testimony before the jury, when defense counsel advised the court that he intended to ask Quinn about C.R.'s purported statement "that she would take [McNeal's] wife and kids away from him," the State made a hearsay objection, and defense counsel asserted neither a hearsay exception nor a constitutional claim. (Tr., p. 620.) As to defense counsel's expressed intent to question Quinn about seeing C.R. and Leesa together after McNeal's arrest, the State made a relevancy objection, and defense counsel again offered no counter-argument regarding relevancy and raised no constitutional challenge. (*Id.*, p. 620-621.) Those circumstances leave no basis for us to conclude that the trial court abused its discretion as to those evidentiary rulings.

**{¶ 48}** Furthermore, the record demonstrates that any error as to those rulings would have been harmless. The mere fact that Quinn in his proffered testimony claimed to have seen C.R. and Leesa in one another's company on two occasions after McNeal's

arrest is at best minimally probative of C.R.'s having a motive to falsely accuse McNeal of rape, or of C.R.'s having conspired with Leesa to plant McNeal's DNA evidence on C.R. Additionally, Quinn indicated during his proffered testimony that he never heard C.R. say that she would take McNeal's kids away from him. Accordingly, McNeal was not harmed by the trial court's refusal to admit any hearsay statement by C.R. about taking McNeal's children.

{¶ 49} McNeal's challenge to the trial court's evidentiary rulings as an abuse of the trial court's discretion therefore is overruled.

iii) McNeal's Constitutional Claim

{¶ 50} Although he raised no constitutional argument before the trial court and also does not expressly mention the Confrontation Clause in his appellate brief, McNeal argues that the trial court's evidentiary rulings "wholly ignored constitutional provisions." (Merit Brief of Tracy McNeal, p. 8.) He advances as authority supporting his first assignment of error case law that engages in a Confrontation Clause analysis. (*Id.*, pp. 8-9, 10, citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The holding in *Davis* is premised on "the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' " *Id.* at 315. Accordingly, we presume for purposes of this appeal that McNeal intends to invoke the Confrontation Clause as support for his argument that the trial court violated the U.S. Constitution in its application of Ohio's rape shield law.

{¶ 51} A defendant who fails to raise a Confrontation Clause objection in the trial court waives all but plain error on that issue. *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 83 (2d Dist.), citing *State v. Habo*, 11th Dist. Portage No. 2012-P-0056,

2013-Ohio-2142, ¶ 35; *State v. Scott*, 10th Dist. Franklin No. 05AP-1144, 2006-Ohio-4981, ¶ 11, fn. 4. "In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights." *State v. Brewer*, 2017-Ohio-119, 80 N.E.3d 1257, ¶ 8 (2d Dist.), citing *State v. Norris,* 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B).

{¶ 52} To affect "substantial rights" for purposes of demonstrating plain error, "the trial court's error must have affected the outcome of the trial." (Citations omitted.) *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. An appellate court should find plain error " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Brewer* at ¶ 8, quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 53} We are unable to conclude that the trial court violated McNeal's rights under the Confrontation Clause by limiting the scope of James Quinn's proposed testimony about the alleged relationship between C.R. and McNeal's wife, Leesa. Significantly, the trial court did not wholly foreclose McNeal from presenting evidence that C.R.'s relationship with Leesa might give C.R. a motive to fabricate a rape charge against McNeal. Instead, the court barred McNeal from presenting testimony only as to "sexual innuendos concerning" C.R. and Leesa. (Tr., p. 67.) The trial court made clear that McNeal remained free to present evidence of C.R.'s possible bias against McNeal due to her friendship with Leesa. (*Id.)*

{¶ 54} The Fourth District's decision in *Johnson* suggests that the exclusion of evidence under the rape shield law does not implicate a defendant's confrontation rights if alternative means exist for the defendant to introduce "nonsexual" evidence of the

victim's motion to fabricate. *See Johnson*, 4th Dist. Ross No. 16CA3579, 2017-Ohio-7257, at ¶ 25. Here, the only "nonsexual" evidence that McNeal attempted to present through Quinn was excluded by the trial court on bases other than the rape shield law. We concluded above that those evidentiary rulings by the court did not amount to an abuse of its discretion; they also do not constitute plain error.

{¶ 55} Moreover, even if those rulings could be viewed as erroneous, the record does not support a conclusion that any such error affected McNeal's "substantial rights." *See Brewer*, 2017-Ohio-119, 80 N.E.3d 1257, at ¶ 8. In cross-examining C.R., McNeal's attorney inquired into her relationship with Leesa; C.R. confirmed that Leesa was her "best friend" and that they were "very close." (Tr., pp. 279, 281.) C.R. also admitted that sometime after McNeal was charged, C.R. was in a car with Leesa when they encountered James Quinn. Although C.R. denied making other statements about which Quinn would have testified and the trial court precluded defense counsel from questioning C.R. about oral sex and other "contact" with Leesa (*id.*, p. 285), C.R.'s affirmative responses about her close and continuing relationship with Leesa lent support for McNeal's bias/fabrication theory without the need for Quinn's testimony.

{¶ 56} Where evidence admitted about relationships among interested parties provides "compelling nonsexual evidence of bias" and "could demonstrate a strong motive to fabricate," the exclusion of evidence about the victim's sexual activities does not implicate constitutional concerns. *See Pennington*, 10th Dist. Franklin No. 91AP-13, 1991 WL 476699, at *8. That is particularly true in the absence of "evidence of an intense romantic relationship" or "sexual evidence inextricably intertwined with bias." *Id.* Here, Quinn's proffered testimony evidenced neither "an intense romantic relationship" nor

sexual activity "inextricably intertwined with bias," *see id.,* but simply hinted at C.R.'s possible desire for a romantic or sexual relationship with Leesa. The record does not support a conclusion that such evidence would have changed the outcome of the trial.

{¶ 57} McNeal's constitutional challenge to the trial court's evidentiary rulings is overruled.

### Assignment of Error #2 – Ineffective Assistance of Counsel

a. Standard of Review

{¶ 58} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley,* 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989).

{¶ 59} Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is also entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

b. McNeal's Ineffective Assistance of Counsel Claim

{¶ 60} McNeal contends that he was denied the effective assistance of counsel due to his trial attorney's failure to cite Evid.R. 616(A) as authority for admitting evidence

to show C.R.'s bias against McNeal. McNeal acknowledges that his trial counsel "arguably" waived an argument on that basis by failing to raise Evid.R. 616(A) in response to the State's objection to James Quinn's direct examination. He points to his attorney's statement that he wanted the trial court "to like me on the next case" (*see* Tr., p. 620) to imply that his attorney did not advocate vigorously on McNeal's behalf.

**{¶ 61}** Under the evidentiary rule McNeal cites, "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." Evid.R. 616(A). "Because the possible bias of a witness is always significant in assessing credibility, the trier of fact must be sufficiently informed of the underlying relationships, circumstances, and influences operating on the witness * * *." *State v. Watson*, 2d Dist. Montgomery No. 26347, 2015-Ohio-4517, ¶ 43, quoting *State v. Williams,* 61 Ohio App.3d 594, 597, 573 N.E.2d 704 (9th Dist.1988). Evid.R. 616(A) thus establishes that evidence of bias has "inherent probative value." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 171, 743 N.E.2d 890 (2001).

**{¶ 62}** Nevertheless, evidence of bias is subject to the limitation imposed by Evid.R. 403(A): "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A)'s balancing test largely corresponds with the balancing test required under the rape shield law – i.e., that the court " 'balance the state interest which the statute is designed to protect against the probative value of the excluded evidence.' " *See Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 66, quoting *Gardner,* 59 Ohio St.2d at 17, 391 N.E.2d 337. As delineated by the Supreme Court of Ohio, the state interest under R.C. 2907.02(D) consists of "guarding

the complainant's sexual privacy and protecting her from undue harassment," "aiding crime prevention" by "encourag[ing] the reporting of rape," and "aid[ing] in the truth-finding process" by "excluding evidence that is unduly inflammatory and prejudicial." *Gardner* at ¶ 17.

{¶ 63} Based on the record, we are unable to conclude either that the probative value of any evidence of bias excluded by the trial court was not "substantially outweighed by the danger of unfair prejudice," *see* Evid.R. 403(A), or that such probative value outweighed the State's interest under the rape shield law in protecting C.R.'s privacy, encouraging the reporting of rape, and excluding unduly inflammatory and prejudicial evidence. *See Gardner* at ¶ 17. As we observed above, the trial court granted defense counsel permission to show C.R.'s motive to fabricate through evidence of C.R.'s close friendship with Leesa, without introducing any purported sexual components of that relationship. As a result, the probative value of any "sexual evidence" excluded by the court did not outweigh its inflammatory and prejudicial effect or the other State interests underlying the rape shield law. *See Pennington*, 10th Dist. Franklin No. 91AP-13, 1991 WL 476699, at *8. No basis exists for inferring that the excluded evidence would have been admitted had defense counsel directed the trial court to Evid.R. 616(A). Accordingly, McNeal cannot establish that his trial attorney performed deficiently by failing to bring Evid.R. 616(A) to the trial court's attention when the State objected during Quinn's direct examination.

{¶ 64} We also do not find defense counsel's isolated comment about wanting the trial court to "like [him] on [his] next case" before that court (Tr., p. 620) to be indicative of deficient performance. Read in context, that remark reflected trial counsel's affirmation

that he did not wish to defy the trial court's evidentiary rulings by going beyond the limitations previously outlined by the court. The statement does not indicate an abandonment of zealous advocacy on McNeal's behalf.

{¶ 65} Finally, McNeal has not demonstrated a reasonable probability that the admission of the excluded evidence would have changed the outcome of his trial. McNeal therefore has failed to satisfy either prong of the test for demonstrating constitutionally ineffective assistance of counsel. *See Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Bradley,* 42 Ohio St.3d at 141-142, 538 N.E.2d 373.

{¶ 66} McNeal's second assignment of error is overruled.

### *Assignment of Error #3 – Insufficient Evidence*

*a.  Standard of Review*

{¶ 67} A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

*b.  McNeal's Insufficient Evidence Claim*

{¶ 68} Pursuant to R.C. 2907.02(A)(1)(c), the elements of rape of a substantially impaired victim are as follows:

(A)(1) No person shall engage in sexual conduct with another who is not the

spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

* * *

(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

{¶ 69} McNeal argues that his rape conviction was based on insufficient evidence of penetration, which is necessary to commit the offense of which he was convicted.

{¶ 70} As used in R.C. 2907.02(A), the term "sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." *State v. Artz*, 2015-Ohio-5291, 54 N.E.3d 784, ¶ 21 (2d Dist.), quoting R.C. 2907.01(A). "Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶ 71} A criminal conviction for rape may be based in whole or in part on circumstantial evidence of vaginal intercourse, and such evidence has "inherently * * * the same probative value" as direct evidence. *State v. Marques*, 10th Dist. Franklin No. 17AP-849, 2019-Ohio-42, ¶ 28-29, citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988), and quoting *Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492. C.R. testified that she was familiar with feeling "wet and sticky down there" after "intercourse," "[a]nd that's what

[she] was feeling" when she awoke after McNeal was in her bedroom. (Tr., p. 252.) Although C.R. was too impaired by alcohol to recall her vagina having been penetrated, her perception that vaginal intercourse had occurred was cognizable circumstantial evidence of "sexual conduct" within the meaning of R.C. 2907.01(A). *See, e.g., State v. Stevens*, 2016-Ohio-446, 58 N.E.3d 584, ¶ 12 (3rd Dist.) (affirming sufficiency of evidence to support penetration element of rape where impaired victim testified that she awoke "very wet" with defendant on top of her, and while she "did not know for certain [that defendant] penetrated her vagina with his penis, * * * she was certain that * * * she felt ejaculate inside her vagina").

**{¶ 72}** Other circumstantial evidence also corroborated C.R.'s sensation of having experienced vaginal intercourse. This court has found evidence sufficient to establish vaginal penetration where that evidence shows that the force of a defendant's body part[10] "caused the victim's labia or outer lips of the vagina to spread." *State v. Grant*, 2d Dist. Montgomery No. 19824, 2003-Ohio-7240, ¶ 38; *see also State v. Brewer*, 2d Dist. Greene No. 03CA0074, 2014-Ohio-3572, ¶ 32, quoting *Grant* at ¶ 30 ("if [an] object is introduced [into the vaginal cavity] with sufficient force to cause the labia majora to spread, penetration has occurred").[11] *Accord State v. Barker*, 2016-Ohio-8006, 75 N.E.3d 738, ¶ 23, 25 (6th Dist.) (affirming sufficiency of evidence to establish sexual conduct where victim testified that, while defendant was touching her genital area, he used one hand to "open it," and nurse who conducted victim's sexual assault examination testified that

---

[10] In that case, the body part at issue was the defendant's index finger rather than his penis. *Grant* at ¶ 31-32.

[11] In *Grant*, we defined the "vagina cavity" as "any part" of the "entire anatomical process" that includes the vagina, vulva, and labia. *Grant* at ¶ 29.

victim said nurse's swabbing of victim's labia minora was "what it felt like when [the defendant] touched me"); *State v. Lindsay*, 3d Dist. Logan No. 8-06-24, 2007-Ohio-4490, ¶ 12, 19 (affirming sufficiency of evidence to prove sexual conduct where victim who was intoxicated and unconscious at time of offense testified to feeling "pain throughout her pelvic region" after she awoke and to being "certain" defendant had penetrated her vagina "at least past the vaginal lips").

{¶ 73} C.R. described having pain in her vagina after she awoke. At McNeal's trial, the nurse who conducted C.R.'s sexual assault examination testified that the posterior forchette area where C.R. complained of pain is "at the base of the vagina * * * where[,] if you were to spread the vagina open[,] * * * it's going to be that tissue right at the base of the vagina." (Tr., pp. 330-331.) According to the nurse, "you don't have pain at the posterior fourchette unless something is trying to enter that area." (*Id.*, pp. 331-332.) The nurse confirmed that C.R.'s complaints of pain were consistent with having been penetrated. (*Id.*, p. 329.)

{¶ 74} Finally, evidence was presented to show that DNA deposited during a sexual encounter while a woman is "supine in bed" may "flow[ ] from her vaginal opening down to the rectal area" (*id.*, p. 328), and that swabs taken from C.R.'s rectum following her sexual assault report contained semen bearing a DNA profile consistent with (although not demonstrably identical to) McNeal's DNA. Viewing the totality of the evidence in a light most favorable to the State, we determine that a rational jury could have found the requisite element of vaginal penetration by McNeal's penis to have been proven beyond a reasonable doubt.

{¶ 75} McNeal's third assignment of error is overruled.

### *Assignment of Error #4 – Manifest Weight of Evidence*

a. *Standard of Review*

**{¶ 76}** In contrast to a challenge to the sufficiency of the evidence, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 77}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

b. *McNeal's Manifest Weight of the Evidence Claim*

**{¶ 78}** In his final assignment of error, McNeal contends that his rape conviction was against the manifest weight of the evidence. In support of that assignment, he again

advances the State's alleged failure to prove that penetration occurred. Additionally, he maintains that a reasonable jury "could not conclude beyond a reasonable doubt that the impairment element was met," because C.R. offered inconsistent testimony as to the amount of alcohol she consumed that night, and the nurse who examined C.R. at the hospital after the alleged assault reported that C.R. was alert, oriented, and coherent. Those arguments are not well taken.

{¶ 79} Having determined above that the evidence regarding penetration was legally sufficient to permit a rational jury to find that element of rape to have been proven beyond a reasonable doubt, we likewise conclude that McNeal's conviction was not against the manifest weight of the evidence due to lack of proof on that issue. In addition to the evidence of penetration discussed in our prior sufficiency of evidence analysis, the jury was presented with Sister's testimony that McNeal emerged from C.R.'s bedroom, red-faced and breathing heavily, while naked from the waist down, and said, "My bad, me and Leesa are in here doing some freaky shit." Sister and the police witnesses all testified that C.R. was extremely upset, complaining of vaginal pain, and insistent that McNeal had raped her. Additionally, the nurse who saw C.R. at the hospital following the incident testified that she was unable to perform a full pelvic examination using a speculum to open C.R.'s vaginal canal because C.R. was in too much physical pain. As a result, the nurse was unable to determine whether C.R. had internal bruising or other objective indicia of vaginal penetration. The resulting lack of physical evidence to corroborate C.R.'s claims does not weigh against a finding that penetration occurred, and the record does not support a conclusion that the jury "clearly lost its way," creating a manifest miscarriage of justice by convicting McNeal.

{¶ 80} In the absence of a statutory definition of "substantially impaired," this court has adhered to Supreme Court precedent holding "that 'substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of h[er] conduct or to control h[er] conduct.' " *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 21 (2d Dist.), quoting *State v. Zeh*, 31 Ohio St.3d 99, 104, 509 N.E.2d 414 (1987). Substantial impairment "may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct." *Id.*, quoting *State v. Dorsey*, 5th Dist. Licking No. 2007-CA-091, 2008-Ohio-2515, ¶ 43. Substantial impairment also may be proven by the victim's own testimony. *State v. Franklin*, 9th Dist. Summit No. 29071, 2019-Ohio-1513, ¶ 8, citing *State v. Daniels*, 9th Dist. Summit No. 25808, 2011-Ohio-6414, ¶ 6.

{¶ 81} Both C.R. and Sister testified that C.R. had consumed vodka to the point of vomiting; Sister said that C.R. also urinated on herself, but C.R. said that she had been too intoxicated to even remember that happening. Sister said that she and Leesa had to change C.R.'s clothing for her and physically carry C.R. from the bathroom to her bed. Further, C.R. described herself as having been "really, really drunk;" "so drunk I really couldn't * * * say yes [or] no." In light of such testimony, despite variations in the amount of alcohol C.R. reported having drunk – whether her own "little" bottle of vodka "plus quite a bit" from the communal bottle or just four or five shots in total – the evidence of record supported a finding that C.R. was "substantially impaired" within the meaning of R.C. 2907.02(A)(1)(c). Evidence that C.R. had recovered sufficiently to appear alert and oriented to the nurse who examined her some two hours after C.R. experienced what she

described as a "shock[ing]" trauma does not detract from that conclusion.

{¶ 82} This case does not represent the "exceptional circumstance[ ]" in which the defendant's conviction should be reversed as being against the manifest weight of the evidence. *See Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. McNeal's fourth assignment of error is overruled.

### *Conclusion*

{¶ 83} The judgment of the trial court will be affirmed.

. . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck
Sarah E. Hutnik
Craig M. Jaquith
Hon. Dennis J. Adkins