[Cite as *State v. Pooler*, 2021-Ohio-607.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28619 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-256 |
| | : | |
| NE'AARICK L. POOLER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of March, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellant

RICHARD L. KAPLAN, Atty. Reg. No. 0029406, P.O. Box 751192, Dayton, Ohio 45475
    Attorney for Defendant-Appellee

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} On November 27, 2019, the State filed a motion for leave to appeal following Ne'aarick L. Pooler's acquittal of one count of rape following a jury trial. We allowed the State's appeal on one issue: whether certain questioning of the complaining witness violated the rape shield statute. The parties briefed the issue and caused the record to be filed with this court.

{¶ 2} Upon review, we conclude that the trial court did not err in allowing defense counsel to recall and question the complaining witness after the defendant testified that she had demanded $50 for sexual activity. (The trial court had prohibited defense counsel from asking any questions of the complaining witness about sexual activity for money during the State's case in chief.)

{¶ 3} On January 31, 2019, Pooler was indicted on one count of rape (force or threat of force), in violation of R.C. 2907.02(A)(2), along with a three-year firearm specification. The alleged victim and complaining witness was M.S. Pooler pled not guilty, and he filed several pretrial motions which are not directly relevant to this appeal.

{¶ 4} On October 9, 2019, at the final pretrial conference, the court acknowledged that some of M.S.'s medical records had been produced in discovery and that defense counsel "may wish to examine" her about those records at trial. The court asked defense counsel to file a motion in that regard and for the State to respond, addressing whether such a request "would run afoul of the rape shield laws or anything in that nature."

{¶ 5} In October 2019, Pooler's attorney filed a motion and a supplemental motion requesting that the defense be allowed to use M.S.'s medical records, because the records were necessary to Pooler's defense. Pooler asserted that his anticipated defense was that "the sexual activity was both consensual and part of a quid pro quo for

money" and that the records, in which M.S. admitted to prostitution, were relevant to this defense.

{¶ 6} The State filed a notice of its intention to present impeachment evidence, namely statements made during a police interview in which Pooler denied knowing M.S. and denied having had sex with her. (These statements had previously been suppressed by the trial court because Pooler's requests for an attorney during the interview had been denied.) The State argued that, after the suppression hearing, defense counsel had indicated Pooler's intention to argue that the sex was consensual, that M.S. was a prostitute, and that she was alleging rape "due to demanding money for consensual sex that Defendant did not pay." According to the State, such a defense was "completely contradictory" to Pooler's statements to the police, in which he had denied knowing her or having sex with her. The State requested that it be permitted to impeach Pooler with his prior statements if he took the stand and testified to "this contradictory set of facts."

{¶ 7} The State also filed a request for a hearing on the applicability of the rape shield law. The State asserted that, during discovery, it had delivered to defense counsel some of M.S.'s therapeutic medical records in which M.S. disclosed prior instances of sexual and drug abuse. Specifically, M.S. referenced that, at the age of 23,[1] "she learned how to prostitute." (At the time of the indicted offense, M.S. was 47 years old.) Further, the State asserted that, following disclosure of these documents, Pooler claimed that he knew M.S. from working at Dollar General, that he "knew her as a prostitute," and

---

[1] The therapeutic record itself was not admitted, and it is unclear whether the admission included the limitation "at the age of 23."

that he refused to pay her for consensual sex, which motivated her to make the rape allegation against him. The State pointed out that M.S. was 52 years old at the time of the motion, and she had had no prostitution-related convictions or any interactions with law enforcement relating to prostitution. The State asserted: "She is not a prostitute. She was not a prostitute in 2015. She did look at a photospread of the Defendant. She is 100% certain that he is the man who violently raped her in May of 2015. This is corroborated by the semen that was left in her vagina. * * * Defendant desires to dirty up the Complaining Witness by things that he discovered in review of documents received after his initial statements. * * *"

{¶ 8} Pooler opposed the State's motion to use suppressed statements in order to impeach him, arguing that he should not have to "choose between taking the stand in his own defense or declining to do so because of the potentially damaging character of statements unlawfully seized from him."

{¶ 9} On October 26, 2019, the trial court granted in part the State's motion to use Pooler's statements for impeachment purposes only if Pooler testified at trial. Based on Ohio's rape shield statute, the court also overruled Pooler's motion to use M.S.'s medical records at trial. Citing *State v. Gardner*, 59 Ohio St.2d 14, 391 N.E.2d 337 (1979), the court concluded that, "prior to Defendant taking the stand and thereby placing before the jury salient evidence of his explanation of why the encounter was consensual, there will be **absolutely no mention** at any point during the trial of Defendant's allegations."

{¶ 10} On the day of trial, outside of the presence of the jury, the following exchange occurred:

THE COURT: * * *

* * * [Defense Counsel] asked a question, and that was she wanted some clarification whether or not during the State's case-in-chief, and the alleged victim * * * were on the stand, would she be permitted to cross-examine her at that time, understanding that because Mr. Pooler would not yet have testified as to the allegations that this was a prostitution encounter - - that could only come in in the Defense's case-in-chief - - [Defense Counsel] wondered, hey, do I nevertheless get to cross-examine [M.S.] on everything except that? And the answer is yes, you do. And I know you'll rigorously observe the Court's order regarding the issue of prostitution * * *.

And then of course, as we talked about, if Mr. Pooler testifies in the Defense's case-in-chief, and the Defense wishes to recall [M.S.] to the stand, that it would be entirely appropriate. And then after Mr. Pooler has injected the issue of prostitution into the case, then [Defense Counsel] would be free to cross-examine M.S. on the topic - - on the subject of prostitution; and if need be, to utilize her healthcare record that raised the issue, I guess for us all, at least in a documentary way, for the first time.

So I think that's clear. There shouldn't be any confusion there.

{¶ 11} At trial, evidence was presented as follows:

{¶ 12} M.S. testified that on May 29, 2015, she was employed at a hotel located in Fairborn as the supervisor of the housekeeping department. After work, she went to the Walmart on Miller Lane and purchased an outfit to wear to a "pool bar" on Main Street, namely the Ashwood Lounge, where she was planning to go with two other women. M.S. testified that she left her home on foot and began to walk toward Main Street; on the way,

she stopped at the home of a friend on Pointview Avenue for half an hour and then proceeded again on foot to meet her friends.

{¶ 13} M.S. testified that, when she turned onto Merrimac Avenue, she observed a sports utility vehicle (SUV) parked by the side of the road, and loud music was coming from the vehicle. The front passenger door was open, and she observed someone talking on the phone by the SUV. M.S. testified that, as she passed the SUV, she "got pulled back" and pushed over the passenger seat of the car. M.S. stated that she felt something hard against her head. M.S. testified that she resisted initially, but then "just gave up," and she was vaginally raped. She stated that her arms and chest were inside the vehicle at the time, and she observed a child's car seat in the back seat of the vehicle.

{¶ 14} M.S. testified that, after the rape, her attacker pulled her out of his vehicle, shut the door, and walked toward the front of the SUV; she ran toward the back, away from him, although her pants were still down. M.S. stated that her attacker "got in his truck and pulled off." M.S. stated that she had never seen him before. She called 911, but she testified that she did not wait for the police to arrive because she was scared; she "found [her] way back up to Main Street and * * * went home." M.S. testified that she called one of the women she had planned to meet, and that woman came to M.S.'s home and took her to the hospital. M.S. stated that she began using drugs after the incident, beginning with "smoking pot, and it just led [her] to harder drugs - - cocaine." She acknowledged that her drug use had led to her being put on probation. At the time of the trial, M.S. had worked at Woodhaven Drug Rehabilitation for over a year, and she testified that she had been in recovery for drugs and alcohol since March 2017.

{¶ 15} Pooler testified that, at the time of the incident, he was employed at Dollar

General and also worked as a bouncer at the Ashwood Lounge. He stated that, on May 29, 2015, he went to the Ashwood Lounge after work for a drink. Pooler testified that, as he sat in his car outside the bar texting his friends, he observed M.S. exit the bar; he said he recognized her as a shopper at Dollar General. Pooler testified that he asked M.S. if it was "deep," or crowded, inside the bar. According to Pooler, when M.S. told him it was not crowded, he decided not to go inside, and he asked M.S. where she was going. He testified that M.S. stated she was going to a friend's home, and he offered to give her a ride. Pooler stated that he had had prior conversations with M.S., and he was friends with her daughter as well.

{¶ 16} Pooler stated that M.S. got in his vehicle, a gray Grand Am. Pooler testified as follows about subsequent events:

Driving, having a conversation. Asked what I'm about to get into, told her I'm probably about to go kick it with my friends. She said - - she offered - - I mean she insisted that she want to come. Told her no, this is probably not your type of crowd. We started having a conversation. How your day; how your day? She telling me like, she's just trying to have fun. I said, oh, for real? So what you're trying to do? She's like, what you trying to do? I'm like, what you trying to do? She like, let me see what you're working with.

{¶ 17} When questioned about how he interpreted M.S.'s request to see "what you're working with," Pooler responded that he interpreted it as a sexual comment, and after she said that, he got "back into the alley" and "pulled [his] penis out." Pooler testified that M.S. gave him oral sex. Pooler stated that they subsequently exited the vehicle, and

he had vaginal intercourse with M.S. at the rear of his car. He stated that they then returned to his vehicle, and as he was pulling off out the alley, M.S. said "that'll be $50." According to Pooler, he asked what the $50 was for, and M.S. stated "we just had sex, didn't we?" Pooler testified he told M.S. she was "tripping," that he was just giving her a ride, and that he would not have let her in his car if he "knew this would be the outcome." Pooler stated that they argued and M.S. tried to negotiate for a lesser amount; "[s]he tried to go from 50 to 40, from 40 to 30. I told her I'm not giving you no money." Pooler stated that when he dropped M.S. off, she said, "so you're not going to give me the money?," and he said no. Then M.S. said, "ha, I got you." Pooler testified that he "never thought four years later * * * [he] would be sitting here [in court]."

{¶ 18} Pooler acknowledged that he had lied to the police in the course of his interview. He stated that, after being denied counsel, he was "scared for [his] life," and he thought lying "was the only way to get out." Pooler stated that he did not force M.S. to have sex with him.

{¶ 19} On cross-examination, Pooler stated that he left the Dollar General at 8:30 on the night of the incident and proceeded to the Ashwood Lounge. He was 20 years old at the time.

{¶ 20} The following exchange occurred with the prosecutor:

Q. * * * And you were going to meet Van, James, and Ryan - - all similar age under 21 year old people.

A. They're a year older than me.

Q. * * * You're the only one who is not allowed in the bar you bounce in.

A.  Yes, sir.

Q. * * * And then you notice the lady from the store.

A.  Yes, sir.

Q.  And this is a person you actually seem to know pretty well.   I'm not saying you're friends, but based on your testimony, not the first time you've seen her.

A.  Yes.   This is not the first time I've seen her.

Q.  Not the second time you've seen her.

A.  No, sir.

Q.  In fact, you're friends with her daughter.

A.  Yes, sir.

Q.  Friends with her niece.

A.  On Facebook I'm friends with her niece.

* * *

Q.  How often would you see her in the store?

A.  Her daughter and her probably like once a week, twice a week.

Q.  Once, twice a week.

A.  Yes, sir.

Q.  You've seen her anywhere else?

A.  No, sir.

Q.  And you were friends with her daughter, but you had no idea that according to you now, she's a prostitute?

A.  Can you say that again?

Q. * * * You're now accusing her of being a prostitute, right?

A. Yes, sir.

* * *

Q. And you worked in the area on North Main Street with regularity?

A. Yes.

Q. You'd admit there's a lot of prostitution over there.

A. Yes.

Q. And you had never seen her as part of it?

A. There's a lot of them.

* * *

Q. * * * So then you have this conversation with this woman you know, but oh, no [sic] is a prostitute, who's a grandma, and you're driving three minutes south and suddenly it turns sexual. Describe for us again how it turned sexual.

A. Told her this might not be [a] crowd that she want to kick it with because they're way younger than her. She said I'm just trying to have fun. So okay. She was like so what you about to do? I said what you trying to do? It started off like that and it led to having sex. I did not rape this lady.

* * *

Q. But this woman at the end of the encounter said, "I got you."

A. Yes, sir.

Q. What did you take that to mean?

A. That she was going to have her nephew, if she have a son, her

son, her husband, or man, or cousins, anything come up to my job probably try to fight me.   Probably anything, you know. I didn't give her what she wanted.   So I thought that it was only to a physical nature not being in jail, turning myself in for driving with no license, and getting charged with rape three days later.

Q.   * * *   Well, four years later.

A.   Four years and three days later.

Q.   She knew you all those four years?

A.   Yes, sir.

Q.   So what you're saying is she decided to get back at you.   Is that what you're saying?

A.   Yes, sir.

* * *

Q.   And now you're telling them today that [M.S.] is a prostitute, aren't you?

A.   Yes, sir.

Q.   Because that would help you out, wouldn't it?

A.   No, sir.

Q.   You would agree with me on the 28th, you did not admit to a crime when you talked to these detectives.   You didn't admit to a crime, did you?

A.   I still didn't commit (sic) to a crime.

* * *

Q.   * * * But the easiest way to get away from these detectives was to deny?

A.   Yes, sir.

* * *

Q.   You think they would've let you out of the room quicker if you said yeah, I raped her?

A.   Probably.

Q.   But you didn't say that.   You said you didn't know this woman. That's what you said, isn't it?

A.   Yes, sir.

Q.   And now you want the jury to believe you know her, you know her daughter, you know her niece, and she's a prostitute?

A.   Yes, sir.

{¶ 21}   After Pooler's cross-examination, defense counsel indicated to the court that she intended to call M.S. to the stand, and the following exchange occurred at sidebar:

[THE PROSECUTOR]:   We reiterate the objection we made in the motion.   There's a balancing test involved with this.   That balancing test waives [sic] the rape shield statute and what it's designed to protect versus the relevance of the testimony.   In this case, there is no indication that this Defendant ever said anything about prostitution.   He's hanging onto a therapeutic record that has one mention of something that at the age of 23. [M.S.] is now 52 years old.   She has no arrests for prostitution.   She has

no interactions with law enforcement for prostitution. This is something she said to a therapist. There is no indication that this was a prostitution event outside of somebody who just testified to being a known liar. And to victimize her again by putting her on the stage [sic], the State thinks is beyond anything that was ever imagined by the rape shield statute.

THE COURT: I appreciate everything you just said * * *. I really do. And I don't think - - I'm going to rule in Defense's favor. So the Defense really need to try to snatch and defeat [sic] from the jaws of victory in this ruling. But I do want to state for the record that this is clearly - - have been a troublesome facts and issues for the Court [sic]. I don't think there's any question that rape shield says what it says. I don't think there's any question that relating to the fact that from this one lone entry in her health care records - - I've got my own doubts about it. But it's there. And I also think that my job is to see to it that Mr. Pooler gets to present a complete defense and part of that is his claim that this was a prostitution encounter and the - - only thing I will say is that the - - it's interesting - - Evilina (phonetic) step up here, will you?

Court of Appeal should know that I just asked my lawyer to enter this little gathering, and that is so as to Mr. Pooler has now testified, the issue of prostitution came up after the fact which is an interesting wrinkle here. But nevertheless, he would offer it, I believe. The Defense's position would be he's offering it to explain why she would have a motivation to lie about the fact that this was a consensual encounter. That is the - - that's the

linchpin for his defense and I think if I - - [Mr. Prosecutor], I've got my doubts, okay, based on everything you just said. I'm damn sure do [sic].

And - - but I think the *Gardner* case and some other cases make it pretty clear - - I think the man gets to present his defense. Defense has read my rulings as has the State, honestly.

And I think I'm going to let him call [M.S.] back to the stand as I said I would, and I don't think I have to caution the lawyer, [Defense Counsel's] ability and the capability and spirit of goodwill to understand that I'm only going to let this go so far. And in fact, it's probably not going to go very far at all unless I miss my guess. But I'm going to let you do it because I think I'm obliged to let you do it in order for Mr. Pooler to present a defense. So that's my ruling. Your objection is noted, [Mr. Prosecutor].

{¶ 22} After M.S. was recalled to testify by defense counsel, the following exchange occurred:

Q. * * * [M.S.], have you ever been engaged in prostitution?

A. No.

Q. Do you recall being in treatment with an organization called South Community, Incorporated in Kettering, Ohio?

A. Yes, that's where I went for my therapy.

Q. Do you recall during the course of this case and your contact with Det. Fraley that she sought to have you sign a medical release for your counseling records?

A. Yes.

Q. * * * And do you recall that Det. Fraley was getting the counseling records of yours?

A. Yes.

Q. And you signed that release?

A. Yes, I did.

Q. Do you recall, [M.S.], during the time that you were engaged in counseling, you were being treated - - I don't know if it was a psychiatrist, a psychologist, or a therapist, were you in active therapy in 2017?

A. If it was at South Community, yes, I was.

Q. * * * And I have your records before me and if I would show you notes from your therapist regarding those therapy sessions, would it refresh your recollection?

A. Yeah.

Q. I'm actually going to hand you the complete record. But I'll just - - I've noted the page.

A. Okay.

Q. * * * First, just for our own edification, I have here your signed release.

A. Yes.

Q. * * * I don't know if you've ever seen these.

A. No.

Q. I would please like to direct your attention to a notation here. I have it highlighted.

A.  "I learned how to prostitute and stole checks." *

Q. * * * So you learned how to prostitute and you stole checks; is that right?

A.  Yeah.

{¶ 23} In response to questions by the prosecutor, M.S. acknowledged that she was ordered to seek drug treatment at South Community while on probation in Montgomery County.  M.S. acknowledged that the records reflected that her drug use began at the age of 23 with crack, and that at the time, she resided in Waukegan, Illinois.  M.S. acknowledged that, during her therapy, she said that she stole checks and learned how to prostitute at the age of 23 in the City of Waukegan, Illinois.  (The therapeutic records themselves were not proffered nor sought to be admitted by either the State or the defense.)  M.S. testified that she did not "continue prostituting" after leaving Waukegan, "[b]ecause some really bad things happened."  M.S. testified that categorizing her as a prostitute at age 47 was "completely wrong."  She further testified that she had lived in the Dayton area since 2007 or 2008, and that she had never been arrested or had interaction with law enforcement based on prostitution during that entire time.

{¶ 24} On October 31, 2019, the jury found Pooler not guilty of rape, and the court entered an order of acquittal on firearm specification.

{¶ 25} On appeal, the State raises one assignment of error:

THE TRIAL COURT VIOLATED OHIO'S RAPE-SHIELD STATUTE WHEN IT ALLOWED POOLER'S COUNSEL TO QUESTION M.S. ABOUT WHETHER SHE PREVIOUSLY HAD BEEN A PROSTITUTE.

**{¶ 26}** Quoting *Gardner*, 59 Ohio St.2d 14, 391 N.E.2d 337, the State asserts that the "objective of the rape-shield law is to discourage the tendency in rape cases to 'try the victim rather than the defendant' by 'guarding the complainant's sexual privacy and protecting her from undue harassment' and 'encourag[ing] the reporting of rape, thus aiding crime prevention.' " The State acknowledges that application of the rape-shield statute, R.C. 2907.02(D), may not unduly infringe upon a defendant's constitutional rights, such as the right to present a defense, and but it argues that the trial court must "balance the interests advanced by the statute against the probative value of the evidence at issue."

**{¶ 27}** The State points out that the trial court initially recognized that the rape shield statute prohibited Pooler's counsel from questioning M.S. about being a prostitute when she testified in the State's case-in-chief, but then allowed M.S. to be recalled in Pooler's case-in-chief "for the sole purpose of questioning her about being a prostitute." According to the State, "there is no legal rationale for applying the rape-shield statute differently depending upon whether the witness is called in the state's case-in-chief versus the defendant's case," and any questioning of M.S. about her past sexual activities violated R.C. 2907.02(D) regardless of when she was questioned.

**{¶ 28}** The State further contends that *Gardner* "actually goes against the trial court's decision," because Pooler did not offer any direct or indirect evidence to suggest "that financial arrangements were entered into between Pooler and M.S. for sexual activities." Rather, Pooler testified to just the opposite: he told the jury that he did not know that M.S. was a prostitute and was unaware that M.S. expected to be paid for the sex they had.

**{¶ 29}** The State argues that *Gardner* "explicitly excludes" the type of

impeachment evidence that the trial court permitted, namely allowing Pooler to impeach M.S.'s testimony denying that she engaged in prostitution by means of her medical records, which indicated she had learned how to prostitute over 20 years earlier in Illinois. Additionally, the State argues that, because M.S. was a defense witness at the time she was asked about being a prostitute, the trial court allowed the defense to impeach its own witness with prior inconsistent statements, in violation of Evid.R. 607(A); Evid.R. 607(A) prohibits a party from impeaching its own witness by means of a prior inconsistent statement without first showing surprise and affirmative damage. The State contends that the defense was not surprised by M.S.'s denial that she was a prostitute; rather, it appears that it was part of the defense's strategy to set M.S. up to make such a denial precisely so that the defense could then score points with the jury by impeaching her. The State argues that the trial court erred as a matter of law by aiding Pooler's lawyers in engaging in such behavior.

{¶ 30} Finally, the State asserts that, significantly, "M.S. was never asked if she engaged in prostitution with Pooler on the night in question. She was instead asked only if she had ever engaged in prostitution generally, and was then confronted with the statement she made to her therapist." According to the State, Evid.R. 404(A) precludes the admission of character evidence "for the purposes of proving action in conformity therewith on a particular occasion," and therefore explicitly precludes the introduction of character evidence of rape victims when such evidence is covered under the rape-shield statute.

{¶ 31} In response, Pooler asserts that the State first elicited testimony that M.S. was a prostitute when it cross-examined Pooler, and therefore the prosecution, rather

than the defense, put the issue of M.S.'s alleged prostitution before the jury. Pooler argues that the State "opened the door" for this type of testimony, directing our attention to the prosecution's closing argument, in which M.S. was characterized as a prostitute. Pooler asserts that, if there was any error in the introduction of such evidence, it was created "when the prosecution cross examined Mr. Pooler introducing the issue of M.S. being a prostitute," in violation of the trial court's October 26, 2019 order about such evidence. Pooler contends that his testimony was "about an extortion attempt" until the prosecution framed the issue in terms of prostitution, in violation of Evid.R. 404(B), and that the State's argument should be rejected under the "invited error" doctrine.

{¶ 32} Additionally, Pooler argues that the rape shield law, R.C. 2907.02(D), did not apply because of the "Multiple Admissibility Doctrine." Citing Evid.R. 404(B), Pooler asserts that he offered evidence of M.S.'s knowledge of prostitution as proof of a motive, intent or plan to falsely accuse him of rape, not as evidence of her sexual history or that she was acting in character as a prostitute. According to Pooler, in light of M.S.'s "threat" – "ha, I got you" -- her history of prostitution and dishonesty were relevant to her motive, intent, or plan.

{¶ 33} Pooler argues that the trial court properly applied the balancing test set forth in *Gardner,* 59 Ohio St.2d 14, 391 N.E.2d 337. He asserts that the defense offered M.S.'s history of prostitution because it was relevant to her motive to falsely accuse him of rape after he refused her "extortion demand" for money after a consensual sexual encounter. Thus, it was not offered to impeach M.S. but to demonstrate her motive to lie about her extortion of Pooler.

{¶ 34} According to Pooler, the State does not acknowledge that it introduced

M.S.'s prostitution in the course of its cross-examination of him. Pooler also argues that the evidence elicited from M.S. in the defense's case-in-chief, i.e., that M.S. was familiar with sex for money and this was a motive for her to lie about the rape, did not violate her "sexual privacy" as it did not get "into specifics or any other private sexual matter and the testimony was not used as harassment," did not put the victim on trial, and would not discourage the reporting of rape. Pooler argues that his "direct testimony was M.S. demanded money after they had a consensual sexual encounter. As a matter of law, demanding money after sex is not prostitution." Pooler argues that the State "interpreted facts indicative of extortion and called them prostitution" and therefore itself raised the issue of M.S.'s being a prostitute. Finally, Pooler asserts that the testimony in the record about M.S.'s sexual history was "not inflammatory or prejudicial" and, in fact, defense counsel's examination of M.S. made her "sympathetic" as a woman who apparently had mental health and substance abuse problems.

{¶ 35} Pooler was acquitted of rape at trial. Although the State's appeal will have no bearing on Pooler's acquittal, the State seeks a legal determination of whether the trial court properly allowed the evidence related to M.S.'s prostitution.

{¶ 36} "Trial courts have discretion over the admission or exclusion of evidence, and we review the court's decision for abuse of discretion. *State v. Dyer*, 2017-Ohio-8758, 100 N.E.3d 993, ¶ 24 (2d Dist.). 'A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary. An abuse of discretion includes a situation in which a trial court did not engage in a "sound reasoning process." Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court.' " *State v. Snowden*, 2019-Ohio-3006,

140 N.E.3d 1112, ¶ 55 (2d Dist.), quoting *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 37} R.C. 2907.02, Ohio's rape shield statute, provides:

(D) Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

(E) Prior to taking testimony or receiving evidence of any sexual activity of the victim * * * in a proceeding under this section, the court shall resolve the admissibility of the proposed evidence in a hearing in chambers, which shall be held at or before preliminary hearing and not less than three days before trial, or for good cause shown during the trial.

{¶ 38} With respect to R.C. 2907.02, this Court has noted:

* * *  "Even if one of the foregoing exceptions applies, introduction of such evidence is permitted only if the court finds that the evidence is material to a fact at issue and that its prejudicial nature does not outweigh its probative value."  *In re Michael*, 119 Ohio App.3d 112, 118, 694 N.E.2d 538 (2d Dist.1997), citing R.C. 2907.02(D).

"Application of the rape shield law may not, however, unduly infringe

upon a defendant's constitutional rights." *Id.* "The Confrontation Clause of the Sixth Amendment to the United States Constitution gives the accused the right to be confronted with the witnesses against him." *State v. Lang,* 128 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 83. Even so, "[t]he rights to confront witnesses and to defend are not absolute and may bow to accommodate other legitimate interests in the criminal process." *State v. Boggs*, 63 Ohio St.3d 418, 722, 588 N.E.2d 813 (1992).

"In determining whether the rape shield law would unconstitutionally infringe on a defendant's rights, a court must 'balance the state interest which the statute is designed to protect against the probative value of the excluded evidence.' " *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 66, quoting *State v. Gardner*, 59 Ohio St.2d 14, 17, 391 N.E.2d 337 (1979). *Accord State v. Hennis*, 2d Dist. Clark No. 2003 CA 21, 2005-Ohio-51, ¶ 48. The Ohio Supreme Court has recognized that "several legitimate state interests are advanced by the [rape] shield law," namely:

First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.

(Footnote omitted.) *Gardner* at 17.

On the other side of the scale, "[t]he key to assessing the probative value of the excluded evidence is its relevancy to the matters as proof of which it is offered." *Gardner* at 18. " 'Cases decided since *Gardner* * * * have established that in order for the contested evidence to be admissible, it must be submitted for a more important purpose than mere impeachment of a witness's credibility.' " *State v. Hicks*, 2d Dist. Montgomery No. 17730, 2000 WL 646505, *4 (May 19, 2000), quoting *In re Michael*, 119 Ohio App.3d 112, 119, 694 N.E.2d 538. *Accord Hennis* at ¶ 52 ("impeaching a witness's credibility is an insufficient reason for admitting evidence that violates the Rape Shield Law").

*State v. McNeal*, 2d Dist. Montgomery No. 28123, 2019-Ohio-2941, ¶ 33-36.

{¶ 39} In *Hicks*, this Court noted that there "are well recognized constitutional limitations to the rape-shield statute which require that provision to yield when its application unduly infringes upon an accused's constitutional right to confront his accusers or present a defense." *Hicks* at *4.

{¶ 40} As noted above, it "is within the sound discretion of the trial court to determine the relevance of evidence and to apply the rape shield law to best meet the purposes behind the statute. * * *." *In re Michael* at *119. The evidence the court admitted from M.S.'s therapeutic records, namely the single line attributed to M.S. and recorded by her therapist, "I learned how to prostitute and stole checks," was not within the exceptions to the rape shield statute, namely evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender. The State's

interests, as set forth above, had to be balanced against Pooler's constitutional right to confront M.S. and present a defense. Pooler's defense was that his encounter with M.S. was a consensual one, and that she was motivated to fabricate the rape allegation when he refused to pay her after the encounter. Pooler testified that M.S. initially indicated that she was "just trying to have fun" before the encounter, but then demanded $50 afterward and continued to try to negotiate payment. Pooler testified that he did not intend to commit forcible rape, and that M.S. only stated "got you," in a manner Pooler perceived to be threatening, when he refused to pay. As the trial court noted, Pooler offered the evidence to demonstrate why M.S. would have a motive to lie about the fact that this was a consensual encounter, which the court characterized as the "linchpin" of his defense.

**{¶ 41}** While the evidence of M.S.'s having admitted to prostitution encroached on M.S.'s sexual privacy, the intrusion was not meant to harass or humiliate her, or to attack her credibility in general. The trial court could have reasonably concluded that the probative value of M.S.'s admission to engaging in prostitution outweighed any interest the State had in its exclusion. It also could have reasonably concluded that application of the rape shield law in this instance would have hindered the truth-finding process. Under these circumstances, the "well recognized constitutional limitations to the rape-shield statute which require that provision to yield when its application unduly infringes upon an accused's constitutional right to confront his accusers or present a defense" applied. Significantly, although the State objected to M.S.'s being recalled to the stand, it did not object to the question regarding prostitution. Hence, the State cannot now be heard to complain that the question asked should have been limited to whether M.S. demanded money for sex from Pooler. We conclude that the court properly applied the

balancing test set forth in *Gardner* in deciding not to exclude the evidence. In other words, we find no error in the trial court's admission of the evidence.

. . . . . . . . . . . . .

TUCKER, P.J., concurs:

{¶ 42} If I had been the trial judge, I would not have allowed M.S. to be interrogated about her alleged, and long ago, prostitution history. Without dispute, this testimony violated the rape shield law. And, in my opinion, the testimony's "prejudicial nature * * * outweigh[ed] its probative value." *In re Mitchell*, 119 Ohio App.3d 112, 118, 694 N.E.2d 538 (2d Dist.1977). Given this, I do not concur in the majority opinion's statement that "application of the rape shield law in this [case] would have hindered the truth-finding process" or the majority opinion's conclusion that, under the circumstances of this case, Pooler's right to confront M.S. trumped the rape shield prohibition.

{¶ 43} Nonetheless, I concur in the majority opinion because I cannot conclude the trial court abused its discretion by allowing the disputed testimony. The trial court applied the balancing test mandated by *Gardner*, 59 Ohio St.2d 14, 391 N.E.2d 337, and after so doing, it permitted the testimony. Based upon the trial court's application of the required balancing test, I cannot conclude that the trial court's evidentiary ruling amounted to an abuse of discretion, though I would have reached a different decision on admissibility.

HALL, J., dissents:

{¶ 44} There is no constitutional right for a defendant to ask a victim of a rape charge, "Have you ever been engaged in prostitution?" (Tr. 640.)

{¶ 45} There is but one question to resolve in this appeal: does the constitutional

right to present a defense trump the rape-shield statute to allow a defendant to inquire whether the victim had ever been a prostitute just because the defendant claims the victim attempted to extort money from him after what he claimed was consensual sex? There is no question in this case that the evidence permitted by the trial court, that the victim may have engaged in prostitution 25 years ago, was within the purview of the rape-shield statute. The trial court recognized the evidence would be excluded by the statute. The issue is whether the defendant's right to present a defense overrode the rape-shield prohibition.

{¶ 46} To put the question in context, I reiterate the relevant factual parameters. The victim testified she was forcibly raped.   Pooler testified that, *after* he and the victim engaged in consensual sex, she demanded money from him. He refused. To be picky, that sounds like extortion, not prostitution.   Prostitution consists of an agreement to perform a sexual act for a price.   Pooler denied he ever made such an agreement.   And any reasonable person who "learned how to prostitute" (Tr. 641) would have required either payment or a demonstration of ability to pay before performance.

{¶ 47} But more importantly, there was no indication that the victim was currently, or even recently, engaged in prostitution. The court was aware that "[s]he has no interactions with law enforcement for prostitution. This is something she said to a therapist. There is no indication that this was a prostitution event" (Tr. 637) other than Pooler's testimony about attempted extortion.   Had the court conducted a more complete hearing in chambers, as required by R.C. 2907.02(E), it would have learned that the victim "learned how to prostitute" at age 23 in Illinois, almost 25 years before the reported rape. (Tr. 644.)   She had not been engaged in prostitution since she left Illinois. (*Id.*) While

living in Dayton for the previous 11 or 12 years, she had not been arrested for prostitution and had not had any interaction with law enforcement related to prostitution (Tr. 647.) She was not a prostitute. (Tr. 644.)

{¶ 48} Analysis must start with the undeniable rape-shield restriction that a victim's sexual activity is, with exceptions inapplicable in this case, inadmissible. "Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." R.C. 2907.02(D).

{¶ 49} The often-referred to case of *Gardner*, 59 Ohio St.2d 14, 391 N.E.2d 337, does not provide support for the trial court's decision. Indeed, *Gardner* stated that evidence of a reputation as a prostitute "is not sufficiently probative of consent to outweigh the state's legitimate interests in excluding the testimony, at least where there is no suggestion in the record that financial arrangements were entered into for sexual activities in this instance." *Id.* at 18. Although the last phrase of that *Gardner* passage has been quoted many times, that phrase was *not* the holding of the case. In *Gardner,* there was no evidence of financial arrangements in the sexual encounter for which Gardner was on trial. The victim testified that she never had engaged in prostitution. Gardner wanted to call a witness to testify that he, the witness, previously had been solicited by the victim for sex. That was not permitted, and the Supreme Court affirmed. So the *Gardner* decision's language stating that "at least where there is no suggestion in the record that

financial arrangements were entered into for sexual activities in this instance" was a limitation on the *Gardner* decision, not the holding of the case, and the phrase was dicta. Therefore, that language should not be used to throw the baby out with the bath water when analyzing rape-shield evidence.

{¶ 50} Without question, "[t]he rights to confront witnesses and to defend are not absolute and may bow to accommodate other legitimate interests in the criminal process." *State v. Boggs*, 63 Ohio St.3d 418, 422, 588 N.E.2d 813 (1992). The directive of *Gardner* is that a court must "balance the state interest which the statute is designed to protect against the probative value of the excluded evidence." *Gardner* at 17. That means a trial court should determine the relevance, if any, of the proposed evidence and weigh its admission against the legitimate rape-shield statute prohibitions so that cases do not devolve into the once-approved tactic of trashing and embarrassing the victim with irrelevant or marginally-relevant evidence outweighed by prejudicial effect.

{¶ 51} Here, the trial court's identified theory of relevance for the disputed evidence was motivation to lie. "The Defense's position would be he's offering [the disputed evidence] to explain why she would have a motivation to lie about the fact that this was a consensual encounter." (Tr. 638.) Such evidence then specifically goes to the credibility of the victim. The rape-shield statute does not permit evidence of a victim's sexual history when offered solely to impeach the victim's credibility unless it is otherwise material to a fact at issue in the case. *State v. Minton,* 2016-Ohio-5427, 69 N.E.3d 1108, ¶ 30 (4th Dist.), citing *State v. Ferguson*, 5 Ohio St.3d 160, 450 N.E.2d 265 (1983). Evidence that a person is engaged in or recently has engaged in prostitution arguably could be relevant to whether the encounter was a consensual prostitution event. But the evidence Pooler

wanted to offer had nothing whatsoever to do with whether the victim was currently or even recently a prostitute, or was streetwalking and picking up strange men in the area where the encounter occurred, or was known to demand money after consensual sex. The evidence the defense offered was not evidence from "Johns" who claimed she was currently, or even recently, engaged in prostitution. I fail to see how evidence that the victim "learned how to prostitute" 25 years earlier was allowed by the rape-shield statute. The trial court concluded that Pooler should be able to introduce evidence of his defense "that this was a prostitution encounter." (Tr. 637.)  In my opinion, that conclusion was directly contrary to the rape-shield statute and case law interpreting it.

{¶ 52} Evidence that the victim "learned how to prostitute" 25 years earlier in another state also simply was not relevant to whether she had a motivation to lie regarding being raped in May 2015.   " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid. R. 401. Here, Pooler claimed M.S. demanded money after consensual sex.   Whether the victim was or had been a prostitute did not make the victim's motivation to lie any more or less probable at all.   Evidence that a person is a prostitute provides no better indication that the person is motivated to get back at a defendant for failing to pay money after sex than any other person who would ask for money after sex and be denied.   A non-prostitute victim who demands money after sex and is rebuffed has just as much if not more motivation to report the encounter as a rape than a prostitute.   In fact, it is more reasonable to conclude that the prostitute, if anything, would be more likely to recognize and accept failure to pay as a hazard of the business and move on.   Therefore, evidence

about what the victim learned 25 years before her testimony made it no more probable that there was a motivation to fabricate a story than someone who did not have such a distant history. Because the evidence was not relevant, it was inadmissible by rule.

{¶ 53} Furthermore, the defense's argument and the court's decision suggest that a victim who demands and is refused money after consensual sex would be motivated by the denial of payment to report the encounter to police, go to a hospital for a rape exam, then years later identify the defendant in a photospread, participate in prosecution by testifying to the circumstances before a jury, and return to court in response to a defense subpoena. In my opinion, the idea that all of this activity was a contrivance because of a failure to pay money demanded after consensual sex was not only unrelated to whether the unpaid victim was a prostitute, it was also just plain ludicrous.

{¶ 54} One only has to look at the defense's first question ("Have you ever been a prostitute?") to see that the evidence was introduced not to address the encounter between Pooler and victim, but to sully the victim's reputation, pure and simple. I borrow sentiments from decisions of sister states. In *Haynes v. State*, 498 S.W.2d 950, 952 (Tex.Crim.App.1973), the court observed that, even if it were proven that the victim was a prostitute, "this would not have proved consent, or made her any the less the subject of rape by force. A prostitute does not lose the right of choice, and may consent or not consent according to her own will." And in *Brewer v. United States*, 559 A.2d 317, 321 (D.C.1988), the court stated: "[I]t cannot be assumed that prostitutes will accept every opportunity that comes along to engage in sexual relations. The fact that a woman is a prostitute, which may prove that she has had consensual sex with others, has nothing to do with whether she consented to sexual intercourse with a particular defendant. Even a

prostitute can be raped."

{¶ 55} I firmly believe that, in the absence of some current or recent evidence of prostitution, the question of what the victim did 25 years ago was wholly inadmissible. But even if one believed that a connection with prostitution had some evidentiary value, on this record the trial court abused its discretion by not limiting the questioning to current events. The trial court carefully should have outlined the parameters of the defense questioning and never should have permitted the defense to ask whether the victim ever had engaged in prostitution.   I note the complete absence of any information, even from Pooler, who claimed to recognize the victim and know her family, of any prostitution by the victim. The available evidence of what the victim may have learned 25 years earlier was quite remote. She denied having engaged in prostitution since she came to Dayton 10 or 11 years earlier.   She had had no arrests or contacts with police regarding prostitution during those 10 or 11 years. The defense could not point to any outside evidence of recent prostitution activity by M.S.   Nor could the defense point to outside evidence of prostitution activity by M.S. that was similar to the facts of the encounter between M.S. and Pooler.   In fact, other than Pooler's contention that M.S. demanded money after sex, there was no testimonial evidence related to the specific sexual encounter at issue that was directly probative of the material issue of consent.

{¶ 56} In *State v. Ciacchi*, 8th Dist. Cuyahoga No. 92705, 2010-Ohio-1975, the question was whether evidence of the victim's solicitations for sex in exchange for money was offered merely to impeach the victim's credibility, which was inadmissible, or whether it was directly probative of the element of consent. There, the defendant testified that the victim had propositioned him on the street and that he went to her apartment after paying

her $20 for oral sex. *Id.* at ¶ 18. The trial court had prevented the defendant from providing further details of the conversation that occurred on the street and inside the victim's apartment. The Eighth District reversed the defendant's conviction and ordered a new trial. The appellate court found the evidence was "not precluded by Ohio's rape shield law" because the victim's statements soliciting sex for money on the street and the victim's statements made at her apartment were "directly related to the specific sexual encounter at issue in the case." *Id.* at ¶ 24. Thus, the testimonial evidence went directly to the issue of consent. *Id.* The same criteria should have applied here. If Pooler had evidence "directly related to the specific sexual encounter at issue in the case," then in the discretion of the trial court it could be admissible. But the trial court abused its discretion below by allowing remote, disconnected, decades-old evidence of marginally probative value.

{¶ 57} For the foregoing reasons, I dissent.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Richard L. Kaplan
Hon. Steven K. Dankof